SPENSLEY vs. THE LANCASHIRE INSURANCE COMPANY.

*February 8 — March 14, 1882.*

NONSUIT. *(1, 4, 5) Circumstances under which peremptory nonsuit will not be ordered.*

INSURANCE AGAINST LIGHTNING. *(2) Policy construed. (3) Lightning defined. (4) Evidence of destructive effects of lightning in a tornado.*

1. Where the plaintiff's evidence, supposing it to remain undisputed, and giving to it the most favorable construction that it will legitimately bear, including all reasonable inferences from it, would sustain a verdict in his favor, a peremptory nonsuit should not be ordered.

2. The policy here sued on, insuring against " all loss or damage by fire " to the property described, expressly declares the insurer liable " for any loss or damage caused by lightning." *Held*, that this language covers all known effects of lightning, and not merely those arising from combustion.

3. The word " lightning," in its ordinary and popular sense, applies to any sudden and violent discharge of electricity, occurring in the course of nature, between positively and negatively electrified bodies, usually developing in its course the phenomena of light, heat and disruptive force.

VOL. LIV — 28

4. The property insured was destroyed by a *tornado;* and this court is of opinion that the plaintiff's evidence (largely set out in the opinion) so tended to show the presence in the tornado of electrical disturbance presenting the usual characteristics of lightning, in the ordinary sense of that word, and that such lightning was an active agent in destroying the property insured, that it was error to order a nonsuit.

5. If a question of fact should ever be taken from the jury on the mere testimony of experts (which is doubtful), at least this should not be done when there is any conflict in such evidence.

APPEAL from the Circuit Court for *Dane* County.

Action on a policy of insurance. The case is thus stated by Mr. Justice CASSODAY:

"On the afternoon of May 23, 1878, a heavy, dark thunder storm, giving evidences of considerable electric discharges along the lower edge, was seen from Mineral Point, stretching along the northern horizon, and apparently eight, ten or twelve miles from the city. At the western part of the storm an ordinary wind cloud sprang out and moved southward until it became distinctly separated from the thunder cloud by clear sky, and reached a point west of the city, when there appeared on the outer edge of this wind cloud, and some eight or ten miles west of Mineral Point, a whirlwind or tornado moving rapidly eastward; and it continued to move in that direction at the rate of about twenty-five miles an hour, through the counties of Iowa, Dane, and Jefferson, a distance of *sixty-four* miles, and varying in width from seventy yards to eighty rods. The tornado was narrow at the bottom and widened out at the top, having a revolving motion in the opposite direction to the hands of a watch, and occupying about thirty-six seconds in passing a given point at the center of its track. The force or forces within the tornado were so powerful as to take up, shatter, destroy, carry away, and scatter in promiscuous confusion, buildings and almost everything animate and inanimate, within its track, not firmly attached to the earth. Among the buildings so destroyed was the plaintiff's dwelling house, situated a little northeast of Mineral Point, and which was at the

time covered by a policy of insurance issued by the defendant to the plaintiff, indemnifying him against all 'loss or damage by fire' to the property described, and expressly agreeing, in the written portion of the policy, 'that this policy is liable for any loss or damage caused by *lightning* to the property insured, not exceeding the sum insured nor the interest of the assured, and subject in all other respects to the terms and conditions herein mentioned and referred to.' Due notice and proofs of loss by 'lightning' were made and served as required by the policy. The defendant, however, denied all liability, on the ground that lightning was not an agency in the destruction of the building insured; and whether it was or not is the only issue involved in this action. Twenty witnesses, including an expert from St. Louis, were sworn and examined in behalf of the plaintiff. At the close of the plaintiff's testimony, the defendant moved for a nonsuit, which was denied by the court. Thereupon four expert witnesses were sworn and examined on the part of the defendant, to wit, James C. Watson, W. W. Daniels, and J. E. Davies, of the University of Wisconsin, and Thomas C. Chamberlain, of Beloit College, and state geologist, who was at Mineral Point at the time of the storm and witnessed the inception of the tornado. At the close of the defendant's testimony it renewed its motion for a nonsuit, which was granted by the court; and from the judgment entered thereon this appeal is brought."

For the appellant there were briefs signed by *P. A. Orton* and by *Lanyon & Spensley* with *P. A. Orton*, of counsel, and oral argument by *Mr. Orton* and *Mr. Spensley*. They cited *Langhoff v. M. & P. du C. R. R. Co.*, 19 Wis., 497, *Imhoff v. C. & M. R. R. Co.*, 22 id., 682; *Schomer v. Hekla Fire Ins. Co.*, 50 id., 575; 3 Wait's Pr., 158; *Colt v. Sixth Av. R. R. Co.*, 49 N. Y., 671; and argued that, assuming the phenomena of the tornado to have been as described by plaintiff's witnesses, and that, as Prof. Tice testified, it was wholly attributable to electricity, which was the only destruc-

tive force in it, the court cannot say, as matter of law, that the defendant is not liable on the policy for the loss.

For the respondent there were separate briefs by *Moses M. Strong*, its attorney, and *J. W. Lusk*, of counsel.

*Mr. Strong* cited the following cases as to the authority and consequent duty of the court to order a nonsuit in proper cases: *Hunter v. Warner*, 1 Wis., 141; *Gardinier v. Otis*, 13 id., 460; *Bacon v. Bicknell*, id., 555; *Dodge v. McDonnell*, 14 id., 553; *Barton v. Kane*, 17 id., 38; *Harrison v. Juneau Bank*, id., 340; *Achtenhagen v. Watertown*, 18 id., 331; *Laubenheimer v. Mann*, 19 id., 519; *Cornelius v. Appleton*, 22 id., 635; *Blair v. Dockery*, 24 id., 502; *Cutler v. Hurlbut*, 29 id., 152; *Jackson v. Bellevieu*, 30 id., 250; *Lawrence University v. Smith*, 32 id., 592; *Delaney v. M. & St. P. Railway Co.*, 33 id., 67; *Smith v. Sloan*, 37 id., 285; *Strohn v. Hartford Ins. Co.*, id., 626; *Hœflinger v. Stafford*, 38 id., 391; *Ewen v. C. & N. W. Railway Co.*, id., 628; *Greening v. Bishop*, 39 id., 553; *Planer v. Smith*, 40 id., 33; *Hoyt v. Hudson*, 41 id., 105; *Meyer v. Hanchett*, 43 id., 248; *Furlong v. Garrett*, 44 id., 125; *Gummer v. Omro*, 50 id., 251; *Gumz v. C., M. & St. P. Railway Co.*, 52 id., 672; *Brusberg v. M., L. S. & W. Railway Co.*, 50 id., 231; *Elmore v. Hill*, 51 id., 365. As to the rule regulating compulsory nonsuits, he cited *Hunter v. Warner*, 1 Wis., 150; *Furlong v. Garrett*, 44 id., 125; *Schomer v. Hekla Fire Ins. Co.*, 50 id., 575; *Dodge v. McDonnell*, 14 id., 553; *Merchants' Bank v. State Bank*, 10 Wall., 637; *Pleasants v. Fant*, 22 id., 121; *Comm'rs of Marion Co. v. Clark*, 94 U. S., 278; *Ryder v. Wombwell*, L. R., 4 Exch., 33; L. R., 2 P. C. App. Cas., 335. He reviewed the testimony at length, contending that there was not such a preponderance of evidence in the case that the insured building was destroyed by lightning, as would have justified a verdict for the plaintiff.

*Mr. Lusk*, after reviewing the testimony, urged that the words "loss or damage caused by lightning," in the policy,

should be construed as ordinary people would construe them, and that neither party to the contract could have understood or intended that such words would cover damages caused by a tornado or whirlwind. 2 Parsons on Con., 494, 500; 3 U. S. Dig., 459 et seq.; *Robertson v. French*, 4 East, 135; *Schuylkill Nav. Co. v. Moore*, 2 Whart., 491; *Kenniston v. Ins. Co.*, 14 N. H., 342; *Babcock v. Montgomery Ins. Co.*, 6 Barb., 644; *S. C.*, 4 Comst., 326; *Austin v. Drew*, 4 Campb. N. P., 360; 2 Marsh., 130; *Everett v. Assurance*, 115 E. C. L., 126.

CASSODAY, J. It is urged by the learned counsel for the respondent, that " to justify a verdict for the plaintiff it must appear, from a preponderance of evidence in the case, that the insured building was destroyed by lightning," and therefore that the nonsuit was properly granted; and in support of the contention several cases are cited. In neither of the three cases cited from the supreme court of the United States was there a peremptory nonsuit, but each was submitted to the jury. Two of the cases were affirmed, and one reversed for instructions in favor of the defendant not warranted by the evidence. In *Doe v. Grymes*, 1 Pet., 469, not cited, it was held at an early day that " the courts of the United States have no authority to order a peremptory nonsuit against the will of the plaintiff on the trial of a cause before a jury." *D' Wolf v. Rabaud*, 1 Pet., 476. It was probably in pursuance of this rule that Judge MILLER refused a peremptory nonsuit in *Hyde v. Barker*, 1 Pin., 305, and *Baxter v. Payne*, id., 501, criticised by counsel, and each of which was decided by a federal court. A similar rule prevails in several of the states. But in this state we have had a different practice from the first, and the right to a peremptory nonsuit in a proper case is conceded by all. The only difficulty arises in the limitation and application of the rule.

In *Barden v. Smith*, 7 Wis., 439, it was held that " it is

error to nonsuit the plaintiff when evidence has been given on his behalf sufficient to justify a verdict in his favor." To the same effect is *Johnston v. Hamburger*, 13 Wis., 175.

In *Dodge v. McDonnell*, 14 Wis., 553, it was held that "the court should not nonsuit a plaintiff when there is any evidence, which, by the most favorable construction that could be legitimately given it, would sustain a verdict in his favor." To the same effect are *Colby v. Franklin*, 15 Wis., 311; *Langhoff v. Railway*, 19 Wis., 489.

In *Imhoff v. Railroad Co.*, 22 Wis., 681, PAINE, J., said: "On a motion for a nonsuit the court is bound to give the evidence the most favorable construction for the plaintiff which it will possibly bear." In support of this he cites New York and Ohio cases, and quotes approvingly this from Judge RANNEY: "All that the evidence in any degree tends to prove, must be received as fully proved; every fact that the evidence, and all reasonable inferences from it, conduce to establish, must be taken as fully established." Page 684.

In *Lawrence University v. Smith*, 32 Wis., 592, the question was whether the direction of a verdict for the plaintiff was error, and DIXON, C. J., giving the opinion of the court, said: "The rule is the same as that which obtains where a motion for a nonsuit is made, and where it is held that the court must look at the facts in the most favorable light for the plaintiff in which the jury would be at liberty to find them, and then be able to say that there is no evidence which would justify a verdict in his favor."

These statements of the law have been fully sanctioned by this court in the cases of *Schomer v. Hekla Fire Ins. Co.*, 50 Wis., 579; *Jucker v. Railway Co.*, 52 Wis., 150.

In *Jones v. Railway Co.*, 49 Wis., 352, Mr. Justice TAYLOR said: "If the plaintiff gives any evidence to support his claim, the case must be submitted to the jury, although in the opinion of the trial judge it may be insufficient to sustain a verdict, or the decided weight of evidence is for the defendant. In such

case this court has repeatedly said that it is the duty of the court to submit the questions of fact to the jury, under proper instructions, and take their verdict thereon."

In *Townley v. Railway Co.*, 53 Wis., 626, several English and American authorities were cited to sustain the rule that, "where the standard of the defendant's duty is a shifting one, and the facts or the inferences to be drawn therefrom are in dispute or ambiguous, the question of the defendant's negligence should not be taken from the jury."

From the authorities cited it is manifest that the trial court was not, and this court is not, called upon to weigh and determine the preponderance of evidence. If a plaintiff has no right to have his cause submitted to the jury unless there is a preponderance of the evidence in his favor, then by parity of reasoning the defendant has no right to have it submitted to the jury unless there is a preponderance of evidence in his favor. If this is so, then, as the evidence must always preponderate in favor of one party or the other, or else be equally balanced, it would follow that the court would always be justified in taking the case from the jury on the motion of one party or the other, except when the evidence was equally balanced. Such, however, is not the rule. The simple question is, whether the evidence in behalf of the plaintiff, had it remained undisputed, and giving to it the most favorable construction it will legitimately bear, including all reasonable inferences from it, is sufficient to justify a verdict in favor of the plaintiff. In other words, is there evidence, when so construed, tending to prove that lightning was an agency in the destruction of the plaintiff's building, within the meaning of the policy?

We agree with LORD ELLENBOROUGH, C. J., in the case cited, that the policy " is to be construed according to its sense and meaning, as collected in the first place from the terms used in it, which terms are themselves to be understood in their plain, ordinary and popular sense," etc. *Robertson v. French*, 4 East, 135.

In *Kenniston v. Ins. Co.*, 14 N. H., 341, the policy was "against loss or damage *by fire*, whether the same shall happen by accident, lightning or any other means." The evidence tended to show that the house had been struck by lightning, and parts of it and the contents materially injured, leaving some slight traces of fire, and a verdict was taken for the plaintiff. Giving the opinion of the court, PARKER, C. J., said: "If the damage was from lightning without any combustion, it is clearly not within the terms of the contract of insurance. The policy does not provide against every damage which may arise from the action of the electric fluid." Because the evidence did not make it certain that the building "was set on fire by the lightning," the direction of a verdict for the plaintiff was held error, and a new trial ordered, with directions to submit that question to a jury. It is very clear from the opinion that had not the policy limited the liability to "losses by fire," the direction of a verdict for the plaintiff would have been sustained, even in the absence of any proof of combustion.

In *Babcock v. Ins. Co.*, 6 Barb., 637, the stipulation in the policy was: "The company will be liable for fire by lightning." The question considered on demurrer was, "whether the destruction of the dwelling house . . . by being rent and torn to pieces by lightning, without being burnt or consumed, is a loss covered and insured against by the policy." The court held that it was not, and gave judgment for the defendant. The ground of the decision is, that "the terms of the policy exclude the idea that it was intended to cover damage by lightning when there was no ignition." That judgment was affirmed in the court of appeals *(S. C.*, 4 Coms., 316); and while the opinion of that court, as well as the court below, is replete with scriptural, literary and scientific research, showing clearly that there can be no such thing as "fire" without "ignition," "combustion" or "burning," yet it affords us but little aid in determining this question of nonsuit. It is, how-

ever, a fair inference from the opinion that, had the policy been against loss by lightning generally, instead of being limited to loss by fire, the company would have been held liable. In the opinion it is said: "Treating electricity as an agent which is capable of producing destructive effects, it is mainly, if not altogether, in reference to its well known modes of *mechanical and chemical* action that danger is to be apprehended to property; and it is therefore only as against these that insurance would naturally be required. No doubt it would be proper for the owner of property to ask for indemnity against all the effects of lightning, as it would clearly be competent for the insurer to limit the policy to certain specified effects. In case of a general insurance against lightning, as the risk would be increased beyond what it would be in case it were limited to only one known effect of it, it is to be presumed that the rate of premium would be proportionately enhanced." Page 336.

The policy before us is a general insurance against lightning, and most certainly covers all known effects of electricity coming under the general head of lightning. What, then, is to be understood by the word "lightning" in its "plain, ordinary and popular sense?" Counsel asks whether the mass of mankind look upon a whirlwind as lightning; whether any person, speaking of a house being destroyed by lightning, supposes he is talking about a tornado? *A tornado* is defined by Webster as "a violent gust of wind, or a tempest, distinguished by a whirling, progressive motion, *usually* accompanied *with severe thunder, lightning*, and torrents of rain, and commonly of short duration and small breadth; a hurricane." The Imperial and other dictionaries and encyclopædias give substantially the same definition. The same dictionaries tell us that a hurricane is "generally accompanied by thunder and lightning, and rain or hail;" and the Imperial Dictionary says that they "*appear to have an electric origin.*" The same dictionary says that lightning is "a sudden discharge of electricity from

a cloud to the earth, or from the earth to a cloud, or from one cloud to another — that is, from a body positively charged to one negatively charged, — producing a vivid flash of light, and usually a loud report called thunder." The same dictionary defines electricity as "the name given to the cause of a series of phenomena exhibited by various substances, and also to the phenomena themselves. We are totally ignorant of the nature of this cause — whether it be a material agent or merely a property of matter. But as some hypothesis is necessary for explaining the phenomena observed, it has been assumed to be a highly subtile, imponderable fluid, identical with lightning, which pervades the pores of all bodies, and is capable of motion from one body to another. . . . Electricity, when accumulated in large quantities, becomes an agent capable of producing the most sudden, violent and destructive effects, as in thunder storms; and even in its quiescent state it is extensively concerned in the operations of nature."

Such are the meanings of the words referred to, in their plain, ordinary and popular sense. The general conviction of danger from lightning is attested by the forked wires projecting from the tops of multitudes of buildings throughout the country; not so much from the combustion which sometimes results from an electrical discharge striking an ordinary object, as a tree or a building, but the disruptive effect which perforates, tears and shatters. The question recurs, whether we can say from the evidence that lightning was present as an active agency in the destruction of the dwelling-house in question. The evidence is too voluminous to be passed upon in review; but the case is so unique and important in its consequences that we are induced to quote two sentences from the printed case, and a few extracts from the summary of facts in the very able, fair and exhaustive brief of the senior counsel for the respondent, who concedes that "a large amount of electricity, lightning and thunder attended this force (the tornado) and was a component part of it." "A few minutes before the

tornado storm came, it was intensely hot; the air was stifling. The air was very calm indeed when the cloud was approaching, and it was calm right after the storm came. It was a clear day; the sun was shining until the storm came up. It was clear right after the storm passed — probably in five minutes. There was hail before the tornado, about the size of a crab-apple, with prickers on them, similar to those on a gooseberry."

The plaintiff, as a witness, said: "We had a patch of wheat adjoining the house, and the next morning it looked as though it had been seared — as if there had been a heavy frost; the leaves were turned white on the tops; looked as though there had been a heavy frost, and were all killed. I noticed the same effect on the grass and trees; it looked exactly like trees that you have seen that had been struck by lightning; they had a dead look about them, just exactly as when you see a tree that has been struck by lightning. The trees were in full foliage. This was general in the track of the tornado. I noticed this the day afterwards; the day or two afterwards I noticed it particularly. The trees were split up just exactly as you have seen trees that had been struck by lightning; you can see the fibres all the way through. They were split in various ways, but were split right down, and some of them you could see the bark stripped off, and some partly stripped off. The storm sometimes stripped the bark off entirely; I have seen several that the bark was entirely stripped off, limbs and all."

The witness Edivine testified: "The vegetation appeared to be burned, and in appearance very much like a frost that had been on the vegetation; that is, the wheat, oats, grass and so forth; also the trees, the foliage was killed. The next day I noticed that the leaves were withered. It splintered the trees entirely up. I noticed the bark stripped off of several trees; stripped entirely off from within two or three feet of the ground up to the very top. I have seen trees that were not

twisted at all; some were twisted, some were not, but the bark torn off."

The plaintiff, *John Spensley*, testified: "There was a large white-oak tree near my house; there were two limbs on it forking off each way, and it struck right vertically where the limbs connected with the tree and split right down. One part of the tree is gone entirely; the other part is standing there yet. It was split to perhaps two or three feet of the surface. I should think the tree was eight or ten inches through; I should think the split portion was six or seven feet long. It was probably forty or fifty feet from the house."

The witness Wasley testified: "Plaintiff had a field of wheat just on the south side of the building, within ten or fifteen feet; it was just as yellow as though there had been a heavy frost. The foliage of the trees was all shriveled up; lost their green color right away the next day."

John Lanyon testified: "I noticed the effect of the tornado within an hour after it passed over *John Spensley's* house. Some trees had been broken and shattered, and were blackened from some cause that I do not know, but had the appearance of some that I have seen that had been struck by lightning. Next morning I noticed the appearance of the leaves of the trees near *Spensley's* house; they were blackened and curled up. I could then trace the track of the tornado by the discoloration of the leaves."

B. Harker testified: "The leaves all through the track of the tornado seemed to be curled up and burnt. I lived on high land, and within a few days after the tornado I could trace the track of the tornado for one and one-half to two miles west, by the color of the leaves being burnt brown and the leaves being green before, and the leaves on each side of the tornado being then green. I saw several trees on each side of *Spensley's* house, that were slivered and split up as if struck by lightning."

Colon Goldsworthy testified: "Could distinguish the track

of the tornado from Kealey's to the brewery for a month afterwards, by the discoloration of the leaves. Two days after the tornado I noticed near *John Spensley's* house that the tops of the grain and grass all seemed to be discolored as if frozen or burnt, I could not tell which; and could see the track of the tornado from any hill for a month afterwards. Within two days after the tornado I noticed, in passing over the track of the tornado, that the trees and rubbish seemed to be smutted or scorched as if burnt; some of them, but not all."

The plaintiff, as a witness, testified: "I saw constant flashes of lightning; they came and went away. There was a continuous roar of thunder; sometimes loud and then not quite as loud. The flashes of lightning seemed to be very near the earth. I remember distinctly one flash. I never saw anything like it in my life. It took my eyesight, I should think, for two or three seconds. I could not see; it was so dazzling."

John Addington, a witness, testified: "When I was in the garden, there came such a flash of lightning that it scared me, so that I dared not stop there. That came from the west. It struck perpendicular. I saw the lightning, and it struck down as though it was going to strike the earth right up, and scared me so I darsent stop. Then in about a minute or two there was another such flash came out of the south. When I got into the wood-shed I sat down on a log of wood, and the lightning came so I thought the wood-shed would be afire every minute. . . . When I had sat there a little while, there came such a flash of lightning as I never saw in my life — never. And when the flash came, the wood-shed was gone like that [indicating] — just as quick as that. I fell down, and it took my hat off as I fell; took my hat right away. I looked up, and the top of the wood-shed was gone; all smashed up; gone right away. The wood-shed was struck on the north side. There was four cords of wood laid against that side, and it just lifted the four cords of wood and the sill and all about half a yard towards me; and the other side, it lifted that about half

a yard away from me, and set it on another beam outside. In the wood-shed at the time it had all the appearance of lightning. When the storm came I could not tell anything else. It would be impossible to tell anything else."

Edmund Edivine, at the time of the storm, was at plaintiff's furnace, one-quarter of a mile from his house, which was on much higher ground than the furnace, southeast from it, and in plain view. He saw the storm approaching from the west, some miles distant. He says: "My attention was particularly attracted to it [the storm] by the flashes of lightning. I saw it when it was very small. There was a cloud on either side, and this one appeared to be coming up in the center of the storm. These others on either side came in contact and appeared then to make a whirling motion right there, as it rolled nearer. I supposed, from the continuous lightning that was flashing from it, that it was something unusual; it must be a cyclone or a tornado, or something of that nature. As it drew near I observed in the center of this cloud a fiery, luminous light. I supposed it was a fire, something like a head-light on a locomotive, and issuing from that flashes of lightning — continued lightning. It was near the earth. As it drew near the light was more brilliant; could see plainer. Could see the light in the center. It rushed right by, and the house was gone in an instant. I saw the storm when it struck the house. I could see the light from behind; flashes of lightning continually — a continuous roar of thunder with it. At the time the storm struck the house, it was in a funnel shape. The lightning was like fire; just like fire light. There was a light illumination when it struck the house; lightning flashing in every direction continually, and a continuous roar of thunder. Noticed just before it came up to the house a ball of fire came right down, and tore up some ground close by the house, between the furnace and the house. The storm, after it passed the house, continued in the same way."

Edward Addington, in his deposition, says: "When the

tornado struck *John Spensley's* house, I was about one-fourth of a mile northwest of *John Spensley's.* house, at the furnace door, and about sixty feet lower than *Spensley's* house. The furnace is in a ravine, and *Spensley's* house is on a hill. I was in full view of *Spensley's* house when the tornado struck it. The tornado appeared to be about one-third of a mile.in width, and coming from the west. When the tornado struck *Spensley's* house, the lightning was cutting in every direction. It was so dark I could not see the house when the tornado struck it."

Anna B. Bennett says: "I could see *John Spensley's* house from my place. I saw the tornado coming towards my house from the direction of *John Spenseley's* house. It was like a rolling cloud of smoke as it came to my.house. The appearance of the tornado was that of fire and smoke, and I smelt the smell of sulphur, and I saw the fire, and it was bright, and it was all around. This was about four o'clock in the afternoon. Our house was completely demolished. The time that I saw the fire lasted less than two minutes; the effects of the tornado did not last any longer than I saw the fire. . . . The fire affected my person at that time. I was burned on the side of my neck, and the back of my head. My hair was burned on one side of my head. I had a very sore spot from the effects of the burn. I do not know of any other cause except the heat that was.in the tornado. There was no fire in the house at the time. The fire I saw in the house that day was what we commonly call lightning."

The plaintiff, as a witness, in speaking of the demolition of the house and deposition of the debris, says: "There was not anything left of the house except the foundation walls, and they were partly thrown in; the house was completely destroyed; there were a great many timbers that were just mashed right up into splinters; seemed as if they had been rubbed together almost, and broken to splinters; the timbers were scattered all over; one of the main sills I should think was carried a hundred yards — a piece of timber 8x8,— and was driven nine feet into the ground, and then broken off in

pieces; this timber was southeast from the house. I found the contents of my building at different distances all around the neighborhood; the principal part of the debris was right there; it was mashed to pieces, and right there on the ground; of course there were pieces of it carried a considerable distance. The lumber that came from the building was all splintered up; there were very few pieces that could be used for anything after the house was destroyed; I do not remember of seeing as much as fifty feet of siding from my house after the storm."

The witness Edivine says: "Everything was shattered to pieces — to splinters. The rubbish was scattered over from 150 to 200 yards of ground, probably — right there. Then, of course, there were parts of the house at a great distance." The witness Wasley says: "The debris from the house was considerably shattered; I don't think you could find twenty-five feet of siding; all split and broken small into kindling wood."

The witness Mrs. Coates, who was in the cellar of the plaintiff's house at the time it was demolished, in describing what occurred immediately after, says in her deposition: "I went into the next room, and smelt the fire and saw the smoke. The cellar was divided into three parts; when the tornado passed we were in the southwest room; we then went into the north part of the cellar, and it was then that I saw the fire and smelt the smoke; and the fire was in the southeast part, which is the vegetable cellar. I supposed my mother was in the ruins and would be burned up, and I called upon Mr. Addington to put out the fire. I saw the fire in the cellar myself; I could not say what it was that was burning; it was a pile of something that had blown there and had caught fire."

The witness Wasley says: " I was at the house about fifteen or twenty minutes after the storm passed; the house was entirely destroyed; I saw fire in the debris of the house. It was in the basement under the main part of the house. The cellar under the main part was divided into three apartments.

Spensley vs. The Lancashire Ins. Co.

. . . The fire was right under the parlor; that would be the main part, on the east side — on the southeast. I was the first to find it. . . . The fire, when I found it, was getting pretty good headway. There was a lot of cloth that had got on fire, and some dirt or rubbish. I took a big piece of plank and beat it out." On cross examination he said: "There was some cloths and rubbish burning there, also some wood — pine — the wood that the building was composed of, burning with this rubbish. I put it out by slapping it with a board. I could not tell how long it had been burning. No member of the family spoke to me about it. I doubt if either one of them had been near the building after the tornado; they were not in the cellar where the fire was. A portion of the floor had been thrown over, and the fire was underneath it."

The witness Edivine says: "At the time, I noticed the smell of sulphur at the house. When I went there first, it was quite powerful; then it kind of diminished."

The plaintiff's mother-in-law, Mrs. Walker, was in his house at the time of the fire, and was killed; and the evidence tends to show that one side of her face was burned, and the other side was bruised and cut, and the hair on one side of her head was burned off close to her head.

Following the rule of law indicated, and giving to the testimony the most favorable construction it will fairly bear, and deeming, for the purposes of this appeal, everything as fully proved which the evidence in behalf of the plaintiff tends to prove, and assuming to be established every fact which such testimony, and all reasonable inferences from it, conduce to establish, can we say there was no evidence which, if undisputed, would justify a verdict for the plaintiff? Applying that rule, can we say that the condition of the atmosphere immediately before and after the destruction; the hail and the rain; the seared condition of all vegetation about the building; the rending of the oak tree a few feet from the house; the bolt of lightning striking close on the other side; the ball of fire like

the head-light of a locomotive at and about the building at the moment of destruction; the fire in the basement immediately after the storm, when there had been no fire in the building immediately before; the burned condition of Mrs. Walker, who was in the house at the time and was killed; and the shattered, splintered and powdered condition of the timbers and almost every part of the building,— did not tend to prove the presence of disruptive discharges of electricity as an active agency in destroying the building? It is true, the wind was present in terrible force, but that increases instead of diminishing the probability of the presence, also, of a powerful electrical force, since a tornado is usually accompanied with lightning, and, as counsel admit, was a component part of it in this case. Had the conditions named existed without the presence of severe wind, we apprehend they would readily have been attributable to the effects of electricity. Did the mere presence of wind in great force entirely remove the evidences and inferences which otherwise existed? It is true, the experts on the part of the defendant attribute much of the phenomena to the severity of the wind. But, as suggested by Mr. Justice Lyon in *Copp v. German American Ins. Co.*, 51 Wis., 643: "We greatly doubt whether the court can properly assume a fact to be proved, and take it from the jury, if the proof (on the part of the defendant) consists mainly of the testimony of experts, as it does in this case. It is only when the testimony leaves no reasonable doubt of the fact that the court should exercise that power; and in the very nature of things there are usually elements of doubt, uncertainty and inconclusiveness in expert testimony. It is upon this principle that, in actions for infringements of patents and trade-marks (which usually depend upon expert testimony), the courts do not decide the question of infringement on demurrer to the pleadings, no matter how clearly the infringement or non-infringement may be alleged therein, but put the parties to their proofs."

It is certainly common in patent cases to submit the ques-

Spensley vs. The Lancashire Ins. Co.

tion of infringement to the jury, even where the patented machine and the infringing machine are both present in court, and thus inspected by the court. True, the law may be properly regarded as a science, but it consists in applying certain principles to admitted or a given state of facts. It certainly cannot be the province of the court, in an action at law triable by a jury, to determine abstruse and occult scientific facts, even when enlightened by the wisdom of learned experts, especially where their opinions are in conflict. We have no disposition to disparage that class of testimony, for it is frequently very highly instructive, especially when confined to the admitted facts of a given case; but its province is to aid those who are required to determine the facts, and in such a case they are to be determined by the jury. Whether the wind theory of the defendant's experts, or the electric theory of Professor Tice, is correct or not, may have an important bearing upon the weight of the evidence, circumstances and inferences tending to prove or disprove the presence of disruptive discharges of electricity as an agency in the destruction of the plaintiff's house. Assuming that two forces were present, wind and electricity, either of which was sufficiently powerful to be an agency in the destruction of the building, yet it would not be for the court to say that such destruction was wrought wholly by the one to the entire exclusion of the other. The question for the jury is, whether lightning was a sufficient agency in such destruction; and the question for the court is, whether, within the rule stated, there is any evidence tending to prove that lightning was such an agency.

The majority of the court being of the opinion that there is such evidence, the judgment of the circuit court is reversed, and the cause is remanded for a new trial.

LYON and TAYLOR, JJ., dissent.