# Caledonian Insurance Company v. Naifeh.

## (And fourteen other cases.)

(Decided March 22, 1929.)

(As Modified, on Denial of Rehearing, May 31, 1929.)

F. M. DRAKE, B. T. DAVIS and W. J. WEBB for appellants.

HESTER & STAHR and F. B. MARTIN for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing in part and affirming in part.

About 3:30 o'clock in the morning of April 9, 1927, a building located in Hickman, Ky., and owned by appellee, S. M. Naifeh, collapsed, and the building and its contents were destroyed. The building and its contents were insured in 15 insurance companies against loss by fire, and against direct loss or damage caused by lightning. The appellee filed with each of the 15 insurance companies proofs of loss, in which he claimed the insured property had been destroyed by lightning. Each of the insurers denied liability on the ground that the building collapsed because of structural defects and as a result of being undermined by flood waters from the Mississippi river. These 15 suits were then filed, the total amount claimed being $27,000. All of the cases were tried together in the lower court, and on this appeal have been consolidated under the caption, Caledonian Insurance Company v. S. M. Naifeh, and will be disposed of by one opinion.

The building was located on the corner of Clinton and Union streets, and fronted south 44 feet on Clinton street, and extended back north along Union street 83 feet. It was a double brick building, the west half being three stories high, and the east half two stories high, with a 13-inch brick division wall running north and south through the center of the building and extending from the basement to the roof of the three-story building. Under the building was a basement 7 feet deep. The Mississippi river approaches Hickman from the north, but just east of the town it turns sharply to the west. Clinton street runs east and west parallel to the river. Immediately north and back of the Naifeh building is the right of way of the Nashville, Chattanooga & St. Louis R. R., and north of the railroad right of way is the river. At the time the loss occurred the Mississippi river was at flood stage, and water from the river covered Clinton street to a depth of 2 feet. The basement of the Naifeh building was flooded, and the water was 12 to 14 inches over the first floor. As hereinbefore stated, the cases were tried together. The jury returned a verdict for the plaintiff, and from the judgments entered thereon the defendants have appealed.

The principal ground relied on by appellants for a reversal is alleged error of the trial court in refusing

to sustain a motion to peremptorily instruct the jury to find for the defendants. They earnestly insist that there is absolutely no evidence tending to show that the loss was caused by lightning. A large number of witnesses were introduced, and the record before us is a voluminous one, although practically all of the evidence is directed to the single issue, was there a direct loss by lightning?

The plaintiff, S. M. Naifeh, was informed of the collapse of his building, and arrived on the scene about 4 o'clock in the morning. The street lights were out, and he could only see the ruins by aid of flashes of lightning. It was then raining, and an electrical storm was in progress. He testified that after the water receded he examined the foundation of the building and found it in good condition, and there was no indication that it had been undermined by action of the flood waters. The west wall fell to the west, the north wall to the north toward the river, some of the brick being some 40 or 50 feet from the building. The south wall fell into Clinton street, and some of the bricks broke windows and doors in the buildings across the street. He further testified that the building was erected about 1860, and had been flooded five or six times within a period of 20 years. The plaintiff endeavored to prove by a number of witnesses that the building was struck by lightning just before it collapsed. The testimony of these witnesses on this point, reduced to narrative form, is as follows:

C. A. Glazier: "I was up in my room over the Starks furniture store across the street from the Naifeh building. I woke about 3:25 o'clock on Saturday morning and looked out of the window. An electrical storm was going on. I had been to bed and had gotten up. I was scared to death any way. I sat up and took a smoke about that time of the morning and it was thundering and lightning right one after another. So all at once there was a clap, a heavy clap of thunder and lightning together, then that quick (snapping fingers) that building fell. Then I went to the window and looked out and I thought it was a storm, a wind storm, but the wind wasn't blowing at all more than it is now, but it was thundering and lightning and raining. However, I didn't see the building when the lightning hit it. I saw out the window and thought it struck where I was rooming. The report seemed to be right opposite. It hit right there close to me, right in the direction of the

Naifeh building. It kind o' blinded me. I couldn't see, you know. It kind o' shocked me, you know, when that building fell.''

Charles A. Lattus: ''I was engaged in the business of running a ferry boat and was staying at the Riverview hotel. I was about half asleep and half awake. I was studying about my boat. It was thundering and lightning and I didn't have my boat tied up good and I was afraid it would come up a storm. It was thundering and lightning all the time. All of a sudden a building went to fall down and it fell at two different times—part of it fell the first time and the second part—they came close together. It was thundering and lightning all the time. The lightning struck from toward the river. I looked out the window about the time when it first struck and knocked part of it. I couldn't say for sure the lightning done it. I looked out of the window there and it was just constant lightning, just a flash of lightning all the time. I had heard the report of lightning when it struck other objects and this sounded just like lightning striking in the direction of that building. There was no wind blowing but just an electrical storm.''

D. Webb: ''On the night that the Naifeh buildng was destroyed I was down on the levee walking and guarding the levee. I noticed it being a bad night and lightning lots and I heard the lightning. Seemed like it struck something. I knew it was bad. Of course I was looking after the levee and I never paid much attention. I had heard lightning strike objects before and this report sounded like the lightning had struck something. I was in West Hickman and the report was to the east in the direction of the Naifeh building. It was kind o' a keen hit, like a clap. It was about 3:30 o'clock in the morning.''

John Sexton: ''I was on the way round on the other street to my boat. I had my boat tied at the Starks furniture store right on the corner. The only thing I heard was a quick flash of lightning, just like some one had thrown a flash light in my face and it blinded me and there was a quick pop and flash right over this Naifeh building. You heard something like a rebound, you know, first one and a second one like a freight train hits then rebounds. I have heard lightning strike trees and stuff like that and I would say it hit the Naifeh building. It was right out in front of me the way I was going, right over the Naifeh building.''

Hardy Williams: "I was in the light plant about three or four hundred feet from the building. I was standing in the door just around the corner from this building. If I had been ten feet over I could have seen down where the building was when it happened, but I was standing in this little door just as it lightened and thundered and I heard this racket but I couldn't tell what it was. It was so dark I couldn't see anything. The night the Naifeh building was destroyed, I seen the lightning and heard the thunder and just in an instant or two I heard the rumble whatever it was. I couldn't tell what it was. I heard a racket. It was dark. I didn't know for a few minutes. I saw the lightning and heard the thunder and shortly after heard the rumbling noise."

Rodney Jones: "I was two miles or two and a quarter from Hickman. I was coming to town in a wagon and assisting a car to town that was stuck out there in a mud hole. And this streak of lightning was directly toward town. It was right in the direction of Hickman. The report and the lightning all happened about the same time. The report was just like lightning had struck something. There was several lightnings that night but this seemed to be the awfullest there was. This was the biggest one I saw. It was just before daylight.

Claud Owens: "Between three and four o'clock in the morning I was about one mile south of town. An electrical storm was in progress and had been for possibly an hour before. Just as we got opposite along there by the school house grounds there was a terrible flash of lightning, so strong that Mr. Jones almost fell out of the wagon. I thought at first it probably struck him from the effect he showed. We noticed that this flash of lightning was in the general direction of Hickman. The report was in a direct northern direction from the way we were headed at that turn of the road. It was nothing more than the usual flash of lightning as though it had struck something, which is as a rule different from the regular flash."

Joe Wall: "I had a crew of men on the city levee. I left the levee about 3:00 o'clock in the morning. I had been home just a few minutes when I heard an unusual report. Immediately after I heard the report I heard a lumbering, falling of something it looked like. The stroke of lightning and lumbering sound were right all together. I went to town and found the Naifeh building down."

Jerry Sparkman: "I am a machinist and on the day before this building was destroyed I was making repairs on a boat. We got it down by the side of Mr. Naifeh's store and dragged it in on the street and struck the ground. I forgot some tools and left them down there and left them on the sidewalk about Mr. Barret's building southwest across the street from the Naifeh building. During the night it got on my mind about me leaving these steel bars on the sidewalk. I got up out of bed, dressed myself and went down there to see about them. When I got the bars I started into Jackson street. I was about the middle of the street I was in. I was almost directly under these wires that run from this transformer, that is, when we got this blast of lightning. Just a keen clap of it knocking me blind. I dumped these bars. About all I know about that was there was a flash and I went stone blind and these things went sky west here and there. I dumped them of course. The electric wires began to play about me then I began to plan and went on up the street. The report was just about as keen a clap as I ever heard. Just like one strikes in those spring rains when close to you. Kind of a keen pop. Almost immediately after this keen clap of thunder I heard the falling of the building. I heard this noise and of course knew the building was falling down. I could see it."

Lee Tullis: "I was at the light plant about 3:30 in the morning. We just had come out of the light plant and were standing there on the walk talking and there come a loud clap of thunder and lightning while we were standing there and just immediately after that we heard this building up there fall and the waves washed down the street up in front of Coles' restaurant. I have heard lightning strike trees in the woods and at this time I heard a loud report just like lightning had struck trees in the woods as I had heard before. The report appeared to be northeast of where I was standing in the direction of the Naifeh building."

J. A. Thomas: "I was a clerk at the LaClede hotel across the street from the Naifeh building and at the time this building fell I was in bed on the third floor. I was asleep and this peal of thunder and lightning came and woke me immediately. I jumped out of bed and tried to turn on the light. The building was quivering. When the lightning flashed again I could see the building had gone down. There was a little wind and a tremend-

ous rain falling. It was coming down in torrents. The lightning was almost continuous and constant for a great while. Looked like one flash would follow another close behind. I have never heard a cannon in my life but I imagine this sound was as much like a cannon as anything could be. Just a loud crash and boom all at once. It sounded like lightning striking something and after I saw it, I know that was what I had heard.''

W. A. Moore, manager of the Kentucky Utilities Company at Hickman, was introduced by the plaintiff as an expert on electricity and the phenomena of lightning. He received information that the Naifeh building had been destroyed, and went there about 4:00 o'clock in the morning. Some time later in the day, at the request of an insurance adjuster representing appellants, he made an investigation to ascertain, if possible, the cause of the destruction of the building. He went over the building, made soundings around the foundation, and examined the down spouts to ascertain if lightning had struck the roof and followed the down spouts to the ground. The foundations were apparently sound. He found a cast iron pipe running up about 5 or 6 feet, and a thin metal tin or galvanized iron pipe leading into the cast iron pipe and cemented in with asphalt. He stated that asphalt is an insulator, and that he considered the down spout poorly grounded and therefore not a good conductor for electricity, and that in his opinion the building had been struck by lightning.

The defendants introduced a number of witnesses, including experienced architects, building contractors, and civil and electrical engineers, by whom they sought to prove not only that lightning did not cause the collapse of the building, but that the collapse was brought about by the action of the flood waters on the weakened foundation walls. J. M. Hoar, a civil engineer of 30 years' experience, inspected the ruins a few days after the building fell and failed to find anything tending to indicate that it had been struck by lightning. In describing the conditions as found by him he said: ''In structures that I have seen struck by lightning there was always some lightning effect on it or mark, jagged effect where the lightning went down the building that conducted it to the ground. Splintered plank would be in evidence in my mind, but I wouldn't say they would have to show any burning. From my examination I did not

find any splintered plank or timbers. I found the center wall deteriorated for a depth of about two and a half to three feet lower than the original floor line and the mortar in the brick was gone—practically gone to sand nearly and very unstable condition, and the floor joists were rotted off on the ends so that they seemed to have furnished no support to the floor at all in their original seats in the brick wall. They had been propped up under the end next to the drug store building with some shoring and the part beyond that shoring on nearly all of them you could see was rotted off. The other ends of the joists that were visible, they were rotted and in about the same condition. My opinion is that the weakness of the support got to such a point that it would not hold the weight it was carrying and the building collapsed in the center wall somewhere ahead of the middle of the building, from the way the roof and the other timbers had fallen in there.''

The testimony of Jack Cole, a contractor of Paducah, Arthur Loomis, an architect of Louisville, and Captain H. T. Slade, a United States army engineer, was substantially the same as that of Hoar. Mr. West Dodd, a manufacturer of lightning rods, who has made a study of the phenomena of lightning and is an authority of recognized standing in scientific circles, stated that there could be no lightning stroke where there was no resistance, and that water has not sufficient ground resistance to cause any mechanical violence. Assuming that a metal down spout extended from the roof of the three-story section of the building into the water of the river, and that lightning struck at or near the corner of the building adjacent to the top of the down spout, he said that the electrical discharge would take the path of least resistance between the top of the building and the water, and would have discharged through the down spout into the water without any mechanical violence, but, if the joints of the down spout were rusty, there would have been an explosion in the joints whch would have broken them and left some evidence of violence or fire at the joints in the pipe. If the down spout and the metal roof made a connection so as to provide a conductor for the lightning, the lightning discharge would have done no damage, but would have passed on into the river below. He stated that in his opinion a stroke of lightning could not have caused the collapse of the building. He based this opinion upon observations of photographs of the

ruins and upon the assumption that over part of the building there was a metal roof covered with composition roofing with a metal down spout running from the roof into the water of the river.

F. Paul Anderson, Dean of the College of Engineering of the University of Kentucky, a recognized authority in all branches of engineering, and concerning whose qualification as an expert on engineering problems no question was, or could be, made, stated that in his opinion the collapse of the building was not caused by the stroke of lightning. In giving his reasons for that opinion, he said: "The pictures indicate to me that the collapse of the building was due to a weakening of the foundation and of the walls—the condition being that these walls or foundations were not sufficient to carry the load imposed upon them. If the building had been struck by lightning, the point at which the lightning entered the building would have been ruptured, but the stroke would not have been of such character as to collapse the whole building. Under the conditions that have been described to me I do not think lightning in that vicinity would have discharged through that building, for the reason that the building was grounded by being surrounded by moisture, and, in fact, water. Lightning never strikes a grounded body. Ordinary town or city buildings with the usual plumbing fixtures and pipes and metal roof and drain pipes are not struck by lightning. The reason is that the discharge of electrical energy in the roof is greatly dissipated, so that there is never any great accumulation of the charge in the building that allows the electrical energy to flow off in other branches of the building. If lightning hit the roof at the southwest corner of the three-story building adjacent to the top of the metal down spout and connected with the metal roof of this portion of the building and the flood waters of the river were over the bottom of the down spout, the natural course would have been down the down spout. If the joints were perfect and the down spout was large enough to carry the discharge there would be no evidence on the down spout of the current having passed through it. If the joints of the down spout were not mechanically perfect fused edges would have been apparent at the joints."

On cross-examination the witness said: "Lightning is a weird sort of thing—if we could tell absolutely what lightning was going to do we would be superhuman. We can only speculate as to what happens within the range

of our experience. Water is a fairly good conductor and lightning will very rarely strike a tree that is standing in water. I can conceive of a time when it will—there might be such an electrical storm that it would, but it is not the usual thing.''

We have quoted at considerable length from the testimony of the more important witnesses on both sides of the controversy, since the principal question to be determined is: Does the evidence sustain the verdict? The testimony of the witnesses for the plaintiff, some of which we have quoted, is sufficient to authorize the conclusion of the jury that lightning struck the building immediately before the collapse, and that the collapse was caused by the stroke. The brick division wall through the center of the building extended 2 feet above the roof on the three-story portion of the building and had no metal covering. Eyewitnesses testified that a flash of lightning occurred apparently over the building accompanied by a loud report, and that immediately thereafter the building fell. From this evidence the jury might reasonably infer that lightning actually struck the building, and that it fell as a consequence of the stroke. Unless this evidence is shown to be at variance with known physical laws, the verdict must stand.

We are much impressed by the testimony of Dean Anderson, and, were we sitting as a jury and weighing the evidence, we no doubt would render a different verdict, but the jury are triers of the facts and courts may not usurp that function. Our only duty is to determine whether or not there is evidence to sustain the verdict; the jury are the judges of the weight to be given that evidence.

Appellants cite the case of Clark v. Franklin Farmers' Mutual Insurance Co., 111 Wis. 65, 86 N. W. 549, as presenting facts similar to the facts in this case. There the evidence, that the loss was caused by lightning, was slight, and the court held that at best it furnished only a slight basis for speculation and conjecture. Here the evidence is sufficient to take the cause of the loss out of the realm of speculation and conjecture and bring it within the field of probability.

In Spensley v. Lancashire Ins. Co., 54 Wis. 433, 11 N. W. 894, a building was destroyed during a tornado. There was evidence of the effects of lightning on trees and other objects near the destroyed building, and the court held this evidence sufficient to sustain the verdict

of the jury that the loss was caused by lightning, though the evidence in that case, that the loss was caused by wind, was much stronger than is the evidence in this case that the loss was caused by the action of the flood water.

In Automobile Insurance Co. v. Thomas, 153 Md. 253, 138 A. 33, 53 A. L. R. 669, fire had occurred in a building separated from the insured building by an alley 10 feet wide. The fire left standing unsupported the wall on the alley side of the lot one story higher than the insured building. About a month after the fire the side wall fell during a storm, and damaged the neighboring building which was insured against direct loss by fire or lightning. The storm during which the insured building was damaged was accompanied by rain and lightning, and there was testimony that lightning occurred immediately before the wall fell, though there was conflict in the evidence on this point. Whether or not the loss was caused by lightning was held to be a question for the jury.

It will be noted that Dean Anderson, and the other expert witnesses introduced by the defendants, predicated their opinions upon the assumption that a metal down spout, connected with the metal roof, ran from the top of the three-story building to the water at its base, and that the lightning, if it did strike the building, struck at or near the top of the down spout. This state of facts was assumed, no doubt, because the plaintiff, Naifeh, shortly after the loss, pointed out this spot as the point where he thought the lightning struck. However, there was no evidence to that effect. The top of the down spout was at the southwest corner of the three-story building; the 13-inch division wall was on the opposite side of the three-story building and extended 2 feet above the roof.

The witnesses for the defendants admitted, and it is a matter of common knowledge, that lightning strikes brick chimneys and walls. The division wall was the highest point on the building, and thus the portion of the building most likely to receive the electrical discharge.

Some point is made of the absence of cracked walls and splintered wood, showing the effect of the lightning stroke, but when the building collapsed the walls fell, and, while necessarily there were some broken and splintered timbers, it would be impossible, as one witness said, to

determine whether they were splintered by the lightning or as a result of falling.

We conclude that the evidence in behalf of plaintiff, including all reasonable inferences from it, tends to show that lightning was an agency in the destruction of the building. It is not shown to be at variance with recognized natural laws, and is sufficient to sustain the verdict.

In view of our conclusion that there was evidence tending to prove that lightning was the direct cause of the loss, the rule, that, where plaintiff's evidence is as consistent with the theory for which he is not entitled to recover as with one for which he is entitled to recover, the case should not be submitted to the jury, and applied in Louisville Gas Co. v. Kaufman, 105 Ky. 131, 48 S. W. 434, 20 Ky. Law Rep. 1069; Bingham v. Continental Casualty Co., 219 Ky. 501, 293 S. W. 968, and other similar cases, has no application to the facts before us.

It is suggested that the court erred in overruling the demurrers to the petitions in these cases, since the building was insured against direct loss or damage caused by lightning, and the petitions did not contain any allegations of direct loss by lightning. The petition in each of these cases alleges that the building was insured against direct loss or damage by lightning, and "that while said insurance policy was in full force and effect, that on April 9, 1927, lightning struck and totally destroyed said building and insured property mentioned." The instructions given by the court required the jury to believe that the loss was directly caused by lightning before they could find for the plaintiff. We are not persuaded that the petitions were defective, but, if they were, the defect was cured by the verdict. Louisville Fire Brick Works v. Tackett, 203 Ky. 367, 262 S. W. 299.

Appellant also complains of alleged misconduct of counsel for plaintiff in his argument before the jury. The principal complaint seems to be of a statement made by counsel for plaintiff that the witness, Hoar, was accompanied by Auber Smith, an insurance adjuster, when the former went to Hickman and inspected the ruins. There is no evidence that Smith was with Hoar at that time. Where the evidence is so voluminous, it is only natural that misstatements as to matters of minor importance should creep into an attorney's argument. The statement

complained of could not have affected the result, and therefore was not prejudicial.

Petitions were filed in eight of these cases to remove the causes to the District Court of the United States for the Western District of Kentucky. It is suggested that the trial court erred in overruling the petitions for removal, but we are of opinion that the court's ruling was proper.

In Naifeh v. Northern Assurance Company, one of the consolidated cases, the petition declared upon policy 2912374 in the amount of $1,000. It is averred in this petition that on March 22, 1926, in consideration of the premium paid by plaintiff, the defendant delivered to him this policy "by which it insured the plaintiff for the term of one year from the 26th day of March, 1926, at noon, to the 26th day of March, 1927, at noon, against all direct loss or damage by fire and lightning or either." The policy was filed with the petition, and showed that it expired on March 26, 1927, several days before the loss occurred.

In Naifeh v. Scottish Union & National Insurance Company, policy No. 7840052 for $1,500 was sued on. The petition averred, and the policy filed with it as an exhibit disclosed, that the policy expired on April 2, 1927, seven days before the loss occurred. The judgments based on these policies are manifestly erroneous, and are therefore reversed. In all other respects the judgments in all of the consolidated cases are affirmed.