# CASES DETERMINED

# August Term, 1886.

Hoye, Administrator, etc., Appellant, vs. The Chicago & Northwestern Railway Company, Respondent.

*September 27 — October 12, 1886.*

*Railroads: Negligence: Street crossing: Flagman: Contributory negligence: Court and jury.*

1. Upon the evidence in this case it is *held* that the question of the negligence of the defendant in backing a freight train across a street in a city, in the night time, without sufficient warning, and the question of the contributory negligence of the plaintiff's intestate, who was killed by the train at such crossing, should have been submitted to the jury.
2. Whether or not, in the absence of any statute or ordinance on the subject, a jury may determine the necessity of a flagman at a street crossing, or predicate negligence of the mere absence of a flagman, yet the presence or absence of a flagman may be shown, in connection with other facts and circumstances, upon the question of the negligence of the railroad company in moving a train over such crossing.

APPEAL from the Circuit Court for *Milwaukee* County. The case is thus stated by Mr. Justice Cassoday:

"July 16, 1883, between 10 and 11 P. M. the plaintiff's intestate, Mrs. Hoye, was found dead in Buffalo street, in Milwaukee, under car No. 8,122 of a freight train standing upon the defendant's track No. 10. This action is to re-

| | |
|---|---|
| 67 | 1 |
| 71 | 260 |
| 72 | 381 |
| 67 | 1 |
| 74 | 256 |
| 74 | 518 |
| 67 | 1 |
| 79 | 636 |
| 67 | 1 |
| 82 | 6 |
| 67 | 1 |
| 85 | 311 |
| 85 | 613 |
| 67 | 1 |
| 86 | 490 |
| 86 | 583 |
| 67 | 1 |
| 88 | 80 |
| 67 | 1 |
| 91 | 340 |
| 67 | 1 |
| 94 | 133 |
| 67 | 1 |
| 97 | 526 |
| 67 | 1 |
| 104 | 372 |

cover the damages thereby sustained. A trial was had in the county court for Milwaukee county, and, at the close thereof, the plaintiff was nonsuited, and the judgment entered thereon was reversed by this court. 62 Wis. 666. The cause was then removed to the circuit court for that county, and a new trial had therein. Upon that trial the court directed a verdict for the defendant. From the judgment entered thereon the plaintiff appeals."

*N. S. Murphey,* for the appellant, to the point that evidence that no flagman was kept by the company at this crossing should have been admitted "for the purpose of showing that the defendant did not use that degree of care required of it by law, and as bearing on the question of how it managed its train on the occasion of this injury," cited *McGrath v. N. Y. C. & H. R. R. Co.* 63 N. Y. 522; *Houghkirk v. D. & H. Canal Co.* 92 id. 219; *Kinney v. Crocker,* 18 Wis. 80; *Welsch v. H. & St. J. R. Co.* 72 Mo. 451; *Shaber v. St. P., M. & M. R. Co.* 28 Minn. 103; *N. J. R. & Transp. Co. v. West,* 32 N. J. Law, 91; *Penn. R. Co. v. Matthews,* 36 id. 531.

For the respondent there was a brief by *Jenkins, Winkler, Fish & Smith,* of counsel, and oral argument by *Mr. Jenkins.* Upon the question whether it was proper to allow evidence showing that no flagman was kept at the crossing, and whether negligence could be predicated of his absence, they cited *Welsch v. H. & St. J. R. Co.* 72 Mo. 455-6; *Houghkirk v. D. & H. Canal Co.* 92 N. Y. 219; *Haas v. G. R. & Ind. R. Co.* 47 Mich. 406; *Penn. R. Co. v. Matthews,* 36 N. J. Law, 534-5; *Telfer v. Northern R. Co.* 30 id. 188, 194; *P. & R. R. Co. v. Killips,* 88 Pa. St. 412; *Bilbee v. L., B. & S. C. R. Co.* 18 C. B. (N. S.), 584; *Stubley v. L. & N. W. R. Co.* L. R. 1 Exch. 13; *Cliff v. Midland R. Co.* L. R. 5 Q. B. 258; *State v. P., W. & B. R. Co.* 47 Md. 76; *Comm. v. B. & W. R. Co.* 101 Mass. 201.

CASSODAY, J. As stated on the former appeal, "the theory of the defense" was, and it still is, "that the train backed up until the front end of the fifth car from the rear was at or near the north line of the sidewalk in question, when it stopped to uncouple the rear four cars; and that while standing in that position the deceased came along on the sidewalk from Van Buren street to the place where the train was standing, and then undertook to pass through under the draw-bar between the front end of the fifth car and the one ahead of it, and while in the act of so doing the train started south, and she was caught under the fifth car and killed as stated." 62 Wis. 668, 669. It is also there stated that "the plaintiff's theory" was, and still is, "in effect, that the deceased reached that part of the sidewalk covered by track No. 10 just as the rear end of the train, backing north unobserved, approached her and pushed or knocked her off into the water, between the rails, immediately north of the north line of the sidewalk; and that, stunned by the occurrence, or otherwise, she there remained while the five cars were backed over her; and that, when the train started back, she was caught by the brake-rod, or some other projection on the under side of the car, and dragged up out of the water onto the plank, and from thence onto the pavement; and that the first scream mentioned was when she was first struck by the rear end of the rear car, and that the last two screams occurred after she was so caught, and while the train was moving south." 62 Wis. 670, 671.

The judgment of nonsuit was then reversed, because the evidence did not conclusively establish the defendant's theory, nor negative the plaintiff's theory; and the further facts that there was evidence tending to show "that no bell was rung, no light or other signal on the rear end of the train, and no guard at the crossing at the time the train backed over the street;" that Mrs. Hoye's body was found

under the car on Buffalo street, with her clothing wet, when the only water present in the vicinity was north of the north line of the sidewalk on the north side of the street; and other facts and circumstances in evidence from which the jury might have been justified in drawing the inference or conclusion that the defendant was guilty of negligence, and that Mrs. Hoye was walking upon the north sidewalk of Buffalo street in the exercise of ordinary care, at the time she was struck.

The facts and circumstances disclosed by this record are very much the same as on the former appeal, and hence need not be here repeated, except as herein otherwise indicated.

Were the impediments to affirming the judgment upon the former appeal removed by the evidence upon the last trial? To ascertain this, we have very carefully examined all the evidence in the voluminous printed case. It will be remembered that Buffalo street ran east and west; that defendant's track No. 10, upon which the accident occurred, crossed that street at right angles, and ran north to the bumper, a distance of about 231 feet north of the north sidewalk, and descended to the bumper from about the middle of the street, which was crowning; that the next street west of the place of the accident was Jackson street, and at right angles with Buffalo street; that from the place of the accident to the street-lamp, lighted at the time, at the northwest corner of Jackson and Buffalo streets, was about 243 feet; that from the place of the accident to the southwest corner of the same streets was about 250 feet; that the distance from the northwest corner of Buffalo and Van Buren streets to the east side of track No. 10 was about 76 feet; that the several streets named were each 80 feet wide; that the average length of each car, including draw-bars, was about 31 feet; that there had been heavy rains up to 4 P. M. of that day, and north of Buffalo street the tracks were mostly or partially

under water; that the distance between the ties there was from 13 to 18 inches; that the distance from the ties to the brake-beam of an ordinary car was about 15 inches, and from the rails to the brake-beam about 11 inches; that the street and sidewalk between and outside the rails of track No. 10 was planked or made of cedar posts, up to about even with the tops of the rails; that the swing-beam of car No. 8,122, which did the killing, came down to about six inches of the top of the rails; that two empty cars were standing on track No. 10, north of the sidewalk; that the train started from Erie street, some two blocks south of the place of the accident, with twelve empty cars, and a switch-engine at the south end, and was backed north on track No. 10 "about as fast as a man would ordinarily walk," with the purpose of uncoupling and leaving the four rear cars on that track north of Buffalo street; that they were so uncoupled and so left; that, upon being so uncoupled, the balance of the train, in a very short time, started back towards the south; that just after it so started south it was very suddenly stopped, when the forward or southerly trucks of the rear car (No. 8,122) as then constituted were somewhere from 20 to 23 feet south of the north line of the sidewalk, and Mrs. Hoye's head was nearly severed from her body, the neck being between the two west wheels of that truck, with her body and feet towards the east or a little south of east. There was evidence tending to show that the body had been dragged to that place from a point about two and a half feet south of the north line of the sidewalk.

Mrs. Hoye lived southwest of the place of the accident, and had that evening been to visit a relative northeast of the place of the accident, and had started for home just before the accident, accompanied by a friend nearly to the north side of Buffalo street, and she was supposed to have gone along westward, on the north sidewalk of that street, until she reached the place of the accident.

On the first appeal, as now, there was evidence tending to show that the bell of the engine was not rung at the time; but the witnesses so testifying were some four or five hundred feet or more from the place where it is claimed the bell was in fact rung when the rear end of the twelfth car approached the sidewalk, going north. Such evidence was negative in its nature, but was not disputed upon the first trial. On this trial it may be somewhat strengthened, but it is flatly contradicted by the fireman who rung the bell, and the engineer who was with him on the engine, and, to some extent, by Wandell, a switchman on the first, second, or third car from the engine, although he is more guarded and less positive on this point. So, if the defendant's negligence depended wholly upon the failure to ring the bell, we might, on the doctrine of positive and negative testimony as frequently announced by this court, decline to disturb the judgment. While the ringing of the bell of an approaching engine moving *forward* towards a street crossing in a city, especially with its accompanying head-light, would afford substantial protection to a traveler upon such crossing, yet such protection is much less obvious, if not entirely absent, when, as here, such engine is backing a long train of cars over such crossing, in the night, and such bell is 400 feet or more distant from the traveler upon such crossing.

It is claimed that the defendant further guarded the safety of passing travelers upon the crossing in question, by placing a man with a lighted lantern at or near the north end of the backing train. The only persons who appear from the evidence to have been employed in managing the train at the time, or guarding the crossing, were John Crowley, as engineer, Fred Haley, as fireman,— who were both upon the engine,— and Louis D. Wandell and James Mahoney, as switchmen. Mahoney was not sworn, and rumor said he had died before the trial.

Wandell testified, in effect, that, as the train started to back north on track No. 10, he was stationed with a lighted lantern on the first, second, or third car from the engine; that Mahoney was stationed with a lighted lantern on the twelfth car from the engine until the train approached the south side of Buffalo street, when he set a brake on this twelfth car to hold back the slack, so, by pitching from the crossing, the cars would not break off, and then went down the ladder on the east side of the car, and crossed over track No. 10, ahead of the car, to the west side of it, and, while walking over the crossing northward, seemingly four to six feet north of the head of that twelfth car, Mahoney gave back-up signals,— to back up three cars' length, the distance from the end of the moving train to the cars at the bunting post,— which signals were repeated by the witness to the engineer; that Mahoney went north of Buffalo street, and next gave a signal to stop, which was repeated by the witness to the engineer, and the train was stopped; that Mahoney then went south from where he gave the stop signal, and pulled a pin between the eighth and ninth cars from the engine; that he then gave a signal, repeated by the witness to the engineer, to pull ahead two cars, for the purpose of clearing Buffalo street crossing; that the train next started up south; that next Mahoney gave a sudden signal, repeated by the witness to the engineer, to stop immediately, and the train was stopped very suddenly.

On cross-examination he testified, in effect, that when Mahoney got down from the northeast corner of the twelfth car to the ground he might have been 20, 30, 40, or even 50 feet south of Buffalo street; and also, among other things, said: "It was my duty to keep a sharp look-out for signals. It was my duty to observe the exact location of that light that Mahoney carried. I mean by that to observe the movement of it. Well, I would have to observe

his position in order to watch his light. I take a signal and communicate it to the engineer. It was my duty to especially observe where he was at the time he gave the signals, with respect to the rear end of the train. I got my orders to do that by watching this signal. . . . It was my duty simply to watch those signals. There was no special duty to watch where he was, at the time he gave the signals, with regard to the rear end of the train. My mind, at that time, was wholly directed to watching the movements of his light. It was not specially directed to watching where he was with respect to the rear end of the train. . . . *Question.* Can you say, under these circumstances, *with any kind of accuracy*, where he really was when the train was backing over there? *Answer. I cannot.* He got off the northeast corner of the car, and then walked across to the west side. I was watching his light, not him, all this time, to see if he gave any signal. I cannot say that my mind was called to watching where he was with reference to the streets, or any point in the street. I was looking for signals." In another place he testified, in effect, that he did not think it possible that "when the rear end of the train passed over the sidewalk that he was away south of where the car backed over," because he saw him cross Buffalo street and go beyond the north line of the sidewalk. The giving of the signal indicated he was up there, and, to the best of his knowledge, he went over the street before the train did; that they left four of the cars in the backing train north of the crossing; that he did not know, of his own knowledge, whether the pin was pulled before the train commenced backing or not; that he did not think it was; that he thought they backed up three cars' length, because the train struck the other obstruction at that time,— it bunted, but not very sharp, to take the slack up, indicating that it struck something; that Mahoney, then having his lamp, pulled the pin between the eighth and ninth cars

after making that bunt; that after he pulled the pin he gave a signal to pull over that crossing two cars, when the train immediately started south, and, when it had gone 18 or 20 feet, Mahoney gave another signal to stop, which the witness repeated to the engineer, and he stopped.

The evidence of Wandell leaves it doubtful as to just what did occur. If this last portion of his testimony is correct, the pin was not pulled until the "bunt;" and, as the train moved south 18 or 20 feet before the other signal to stop suddenly was given, then, as the train moved south 18 or 20 feet more after the last signal, it is evident he must have pulled the pin at a point 40 feet or more north of the sidewalk, and where the water stood upon the track. If this is all so, it is difficult to perceive the object of Mahoney in setting the brake on the twelfth car, as he testified, and thus hold the slack, so that "by pitching from the crossing they [the cars] would not break off," unless he pulled the pin before starting back, as intimated might have been done, in which event it would have uncoupled itself. On the other hand, if the uncoupling was done near the middle of the street,— the divide,— then the object of setting the brake is apparent, and the other portion of his testimony as to Mahoney walking southward from the north side of the street to the place of pulling the pin would be consistent with it, and also with the engineer's testimony, which will be presently noticed. The want of precision in Wandell's testimony, however, is not removed by the testimony of the fireman and engineer.

The fireman, Fred Haley, testified, in effect, that he looked out of the east side of the engine; that Wandell was on the car next to the engine all the way backing up, giving signals to the engineer; that he got no signals on the east side of the train; that Mahoney was not on that side; that the north end of the train was up against the bunting post when the train stopped, because he heard and felt the jar.

The engineer, Crowley, testified in effect that he looked out of the west side of the engine, and the fireman out of the east side; that, when the train started to back up on track No. 10, Wandell was stationed on the car next to the engine, and remained there all the time the train was backing north; that when the train so started to back Mahoney was upon the back or north end of the train with his lantern; that Wandell gave the signals for backing up by car lengths; that after the train came to a stop after backing far enough, he waited for signals from Wandell; then saw Mahoney going over the north end; he was on the other end of the crossing, coming this way,— on the north side of Buffalo street,— with his lantern; that he saw him stop as though he was going to pull a pin and uncouple the car; that he gave no signal then; that he received a signal after Mahoney came ahead; that Mahoney walked across the crossing a way, and gave a signal to go ahead home, and Wandell repeated it about the same time; that it seemed to him that Mahoney pulled the pin at the north end of the crossing,— over the north end of the crossing; he said, "I mean on the north side of the crossing;" that after Mahoney pulled the pin he and Wandell, about the same time, both gave a signal to go ahead, and he did, when he got from Wandell a sharp signal to stop suddenly and he did in about half a car length.

On cross-examination he testified, in effect, that the train struck the cars on the north end, and stopped at the bumping post, he should judge, a minute or a minute and a half; that that was the first time it stopped after it commenced backing north; that he did not know of any brake being put on; that he got signals in car lengths and half car lengths, while backing up, and before he got to the bumping post; that he received no signal to stop from the time the train commenced backing until it bunted against the cars; that at that time he could not see Mahoney,— was

not then looking that way; that he saw Mahoney on the top of the car when it commenced to back, and that was the last he saw him until after the train stopped backing over the crossing; that he did not know where Mahoney was when the train struck; that Mahoney came ahead,—came from the north with his lantern, and stepped in with his lantern, but did not know whether he pulled the pin; that he then came out, and started ahead south before he gave the signal; that both Wandell and Mahoney gave the signal about the same time; that he should judge Mahoney was more south of the center of Buffalo street when he gave the signal; that he might have been on the south side of Buffalo street when he gave the signal, but did not think he was south of it; that his attention was not called particularly as to where Mahoney was; that he was watching the lights, but Mahoney could not have been away south of the street, as a matter of fact; that he took his signal to stop suddenly from Wandell; that he did not then see Mahoney, and was not looking for him.

If the engineer is correct in stating that Mahoney did the uncoupling at or near the center of the street, or on the south part of it, and that is corroborated by a portion of Wandell's testimony, then it is very certain, contrary to other portions of the testimony of both, that the train backed at least two car lengths or more after the pin was pulled; for that occurred at the north end of car No. 8,122, the south end of which was only about 20·feet south of the north line of the north sidewalk when it finally stopped after the accident; and, besides, it is admitted by all that it had started south before the signal to stop suddenly, and ran some 18 or 20 feet after that signal was given.

The three witnesses on the part of the defense, as to the management of the train, make it certain that, although Mahoney got down from the twelfth car on the east side of the train just as it was approaching the south side of Buf-

falo street, he at once passed over track No. 10 to the west side of that track, and continued on that side. Since Mahoney did not walk along on the east side of track No. 10, it is certain that Mrs. Hoye could not have got any benefit from his lantern unless he was north of the end of the train. If the evidence conclusively established, as a fact, that Mahoney, with his lighted lantern, walked along the west side of that track, No. 10, from four to six feet north of the rear or twelfth car, until he got to the north line of the street, it would seem to have been a substantial warning and guard to travelers upon the sidewalk, who might otherwise, in the exercise of ordinary care, have passed in front of such backing train. But can we say, from the evidence mentioned, that he did keep north of the end of the moving train? Upon this question as to whether the trial court was justified in directing a verdict for the defendant the plaintiff is entitled to the most favorable construction the evidence will bear. So considering the evidence, can we say that it was conclusively proved that Mahoney did so continue to walk north of the end of the train? The engineer was some 400 feet south of the north end of the train, and, besides, disclaims seeing him until after the train bunted. Assuming that Wandell was on the car next to the engine, as testified to by both the fireman and engineer, as we must upon this appeal, then he was some 340 feet south of the north end of the train. Wandell admits, in effect, that he was absorbed in watching the movements of Mahoney's lantern, so as to repeat his signals to the engineer, and could not tell just where Mahoney was at any one time, with respect to the north end of the train. But, assuming that he did, would it have been possible for him, at that distance, looking lengthwise the train, even in a moonlight night, to tell with accuracy whether Mahoney was a few feet north of the end of the train, or even with it, or a few feet south of the end of the train? Looking in that

direction, he would be able to say with some accuracy whether Mahoney was near the track or some distance west of it, but to say just where he was, in the direct line of vision, with respect to the north end of the train, could, at most, be a matter of conjecture, as every one must know from common observation.

Since Mahoney was on the west side of track No. 10, and assuming that Mrs. Hoye was then going towards that track from the east, it would follow that if Mahoney with his lantern was some distance south of the end of the moving train, it would afford her very little or no protection whatever, as, in that event, a portion of the car or train would be between her and the lantern. If the four cars were uncoupled by Mahoney in the street, or on the south side of the street, as testified to by the engineer and indicated in a portion of Wandell's testimony, then he was at the time four car lengths, or about 124 feet, south of the north end of the twelfth car. In view of the want of precision as to just where Mahoney was during all the time with reference to the rear end of the train, and the inconsistency or confusion in different portions of the evidence of Wandell and the engineer as to the management of the train, we cannot say that the jury would not have been justified in finding from the evidence that the defendant was negligent in backing the train over the street without sufficient signals or guards upon or near the rear end to warn travelers thereon; and especially is this so since three witnesses on the part of the plaintiff, each on one of the west corners of Jackson and Buffalo streets, and nearer to the north end of the train than Wandell, and each in a better position to tell whether there was a man with a lantern on the west side of track No. 10, at or near the end of the train, and each of whom testified that he saw the end of the train passing over the street northward, but saw no man with a light at or near it, and could have seen one had

there been one there. This is somewhat strengthened by evidence on the part of the plaintiff that the first scream was heard while the train was backing north; and the further evidence that Mrs. Hoye's clothes were wet, when the surface between the tracks was dry.

Upon the whole evidence, the jury would have been justified in finding that Mahoney did not go north of the center of the street, and that his lantern was between him and the train, so that his body prevented the plaintiff's witnesses from seeing it, or else, from some other cause, it was unobserved by them; especially, in view of the fact that Mrs. Hoye was found dead upon a public street. The question does not come within the rule of positive and negative testimony mentioned. It does come within the restrictive rules as to trial courts taking causes from the jury where portions of the evidence are conflicting, some facts are disputed, and the inferences to be drawn from some admitted facts are such as might lead to a difference of opinion among fair-minded men. We are asked to definitely state such rules in this case, but we deem it unnecessary, since the rules have been firmly settled by this court through a long series of decisions, and may as easily be read in one volume as another,— when they can all be found upon the same shelf where this will eventually go. For some of the more recent cases, citing the earlier cases, see *Townley v. C., M. & St. P. R. Co.* 53 Wis. 626; *Spensley v. Lancashire Ins. Co.* 54 Wis. 433; *Sabotta v. St. Paul F. & M. Ins. Co.* 54 Wis. 687; *Hill v. Fond du Lac,* 56 Wis. 242; *Johnson v. C. & N. W. R. Co.* 56 Wis. 274; *Nelson v. C., M. & St. P. R. Co.* 60 Wis. 320; *Kaples v. Orth,* 61 Wis. 531; *Hoye v. C. & N. W. R. Co.* 62 Wis. 666.

Without committing ourselves upon the question as to whether, in the absence of any statute or ordinance upon the subject, a jury would be authorized to determine the necessity of a flagman, or to predicate negligence upon the

AUGUST TERM, 1886. 15

Hoye, Adm'r, etc. vs. The Chicago & Northwestern R. Co.

mere absence of a flagman, yet we think the presence or absence of a flagman may be proved as an item of evidence to be considered by the jury in connection with all the other facts and circumstances in the case, upon the question of the defendant's prudence or negligence in moving the train at the time and place in question. This is nothing more than to allow proof of the actual condition of things at the time. As to the authorities on the subject, see briefs of counsel.

Can we say, as a matter of law, that Mrs. Hoye was, at the time and place in question, guilty of contributory negligence? She must have known of the crossing, and that trains were liable to pass over the street and sidewalk at that point. Undoubtedly she was bound to use her eyes in looking, and her ears in hearing, and to act prudently upon the knowledge thus acquired. *Williams v. C., M. & St. P. R. Co.* 64 Wis. 4. But it must be remembered that the burden of proving contributory negligence is, ordinarily, upon the defendant. *Randall v. N. W. Tel. Co.* 54 Wis. 147; *Hoth v. Peters,* 55 Wis. 405; *Kelly v. C. & N. W. R. Co.* 60 Wis. 482. Such contributory negligence, when not disclosed by the testimony on the part of the plaintiff, is purely a matter of defense. *Ibid.; McNamara v. Clintonville,* 62 Wis. 209. This being the fixed rule of law, it cannot be conclusively presumed that Mrs. Hoye did not, at the time and place in question, look, listen, and prudently act upon the knowledge thus acquired. It was in the night. The restrictive rules against trial courts taking causes from juries, above mentioned, are equally applicable to contributory negligence, and are supported by the authorities cited. Certainly, numerous cases might be cited from this and other courts where the question of contributory negligence was held properly submitted to the jury, or ought to have been, notwithstanding the injured person walked upon the track in front of the passing train. Some of these cases occurred

in broad daylight. *Langhoff v. M. & P. du C. R. Co.* 19 Wis. 489; *Urbanek v. C., M. & St. P. R. Co.* 47 Wis. 59; *Eilert v. G. B. & M. R. Co.* 48 Wis. 606; *Ferguson v. Wis. Cent. R. Co.* 63 Wis. 145; *Railway Co. v. Whitton,* 13 Wall. 270, 275. In the last case cited, Mrs. Whitton and Mrs. Woodward were killed by a backing freight train in the day-time. A verdict was obtained before Judge DRUMMOND, and affirmed on writ of error, although it did not appear that they did not see the approaching train. The same was true as to one of the trains in the *Langhoff Case, supra.* On the second appeal of that case, however, it appeared from the evidence that she must have seen both trains. 23 Wis. 43.

Upon all the facts and circumstances in this case, we must hold, as upon the former appeal, that the question of contributory negligence was one of fact for the jury, and not of law for the court.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

See note to this case in 29 N. W. Rep. 647. — REP.