CASE 12—ACTION FOR DAMAGES—DECEMBER 13.

## Louisville Gas Co. v. Kaufman, Straus & Co., Etc.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

1. NEGLIGENCE—FAILURE OF PROOF.—When the question is one of negligence or no negligence and the evidence is equally consistent with either view, the party upon whom the burden of proving the negligence rests must fail, whether the action be tried before a jury or as a question of fact by the chancellor.

2. CORPORATIONS—LIABILITY OF ONE FOR THE ACTS OF ANOTHER ON ACCOUNT OF OWNERSHIP OF THE ENTIRE CAPITAL STOCK.—The ownership by one corporation of the entire capital stock of another does not operate to make the first named liable for the negligent acts of the other, the latter maintaining its corporate existence.

| 105 | 131 |
| 114 | 84 |
| 105 | 131 |
| 116 | 558 |
| 116 | 781 |
| 105 | 131 |
| 116 | 558 |
| 116 | 781 |
| 105 | 131 |
| 118 | 721 |
| 105 | 131 |
| 121 | 712 |
| 105 | 131 |
| 128 | 730 |
| 105 | 131 |
| 131 | 732 |

JOHN W. BARR, JR., PRYOR, O'NEAL & PRYOR, HUMPHREY & DAVIE, FOR THE APPELLANT.

1. The boiler which exploded did not belong to the Gas Company, and the men who operated it were not employed by the Gas Company; and, therefore, there could be no liability on the Gas Company for the explosion. There was no judgment rendered against the Electric Light Company; and it is not before the court on this appeal.

2. The fact that the Gas Company bought, from the stockholders of the Electric Light Company, all of their stock, and transferred 45 shares of it to nine men who were elected directors of the Electric Light Company, only made the Gas Company one of ten stockholders in the Electric Light Company; and did not suspend the corporate existence of the Electric Light Company, or render the Gas Company liable for the negligence of the Electric Light Company or its employes, if any negligence there was. L. & N. R. R. Co. v. Howard, 15 Ky. Law Rep., 26; Atchison R. R. Co. v. Cochran, 19 Am. St. Rep., 133; R., N., I. & B. R. R. v. Richmond Construction Co., 68 Fed. Rep., 105; Atchison R. R. v. Davis, 54 Kansas, 209; Pullman Co. v. Missouri R. R. Co., 115 U. S., 587; Exchange Bank v. Macon Co., 97 Ga., 1; Newton Co. v. White, 42 Ga., 148; Winona R. R. Co. v. St. Paul R. R. Co., 23 Minn., 359; Cook on Stockholders (3d ed.) Secs. 6, 631, 709; Thompson on Corporations, Sec. 6653; Boone on Corporations, Sec. 199; Southern Kansas R. R. Co. v. Towner, 41 Kansas, 72; Humphrey v. McKissick, 149 U. S., 304; Button v. Hoffman, 50 Am. Rep., 131; Briscoe v. Bank of Kentucky, 11 Pet., 323; Kentucky v. Wistar, 3 Pet., 437.

3. The fact that the stock in the Electric Light Company was transferred, by its former stockholders, to the Gas Company, and that the Gas Company had a portion thereof transferred to nine persons to qualify them as directors would none the less make those nine directors stockholders; and as the organization of the Electric Light Company was thereby preserved, so that it is still in operation, it prevented the application of the rule, that where there is but one stockholder, the corporate organization and powers are necessarily suspended. Eisenman v. Banking Co., 94 Ky., 93; Cook on Stockholders (3d ed.) Sec. 623; *in re,* Lawrence, 44 N. J. L., 529; Russell v. McClelland, 14 Pick, 63; Smith v. Smith, 57 Am. Rep., 336; Thompson on Corporations, Sec. 6653.

Louisville Gas Co. v. Kaufman, Straus & Co.

4. The fact that the stock in the Electric Light Company was transferred to some, or all, of the nine directors without their paying for it; or even if it was transferred to them as a gift; would make no difference; inasmuch as the corporate organization would be, and was, equally well maintained, irrespective of what consideration passed for the transfer of the stock to the directors to qualify them. Cook on Stockholders (3d ed.)   Sec. 623; *in re* St. Lawrence Co., 44 N. J. L., 529.

5. The fact that the Gas Company was the owner of the greater portion of the stock of the Electric Light Company and that as such stockholder it did or could cast the controlling vote in the Electric Light Company elections, did not destroy the Electric Light Company, and did not make the Electric Light Company, the agent of the Gas Company its stockholder. A company is not an agent of its stockholders; and a company that does not exist can not be an "agent." L. & N. R. R. Co., v. Howard, 15 Ky. Law Rep., 26; Richmand & Irvine Co. v. R., N., I. & B., 68 Fed. Rep., 105; Atchison R. R. Co. v. Davis, 54 Kansas, 209; Atchison & Topeka Co. v. Cochran, 19 Am. St. Rep., 129; Pullman Palace Co. v. Mo. Pac. R. R. Co., 115 U. S., 587; Exchange Bank v. Macon Construction Co., 97 Ga., 1; Thompson on Corporations, vol. 5, Sec. 6653; Cook on Stockholders (3d ed.) Sec. 6, note, Sec. 631, Sec. 709 and note; Newton Mfg. Co., v. White, 42 Ga., 148; Winona R. R. Co. v. St. Paul R. R. Co., 23 Minn., 359; Boone on Corp., Sec. 199; Louisville Bank. Co. v. Eisenman, 94 Ky., 93; Southern Kansas R. R. Co. v. Towner, 41 Kansas, 72; Swift v. Smith, 57 Am. Rep., 336; Humphrey v. McKissick, 149 U. S., 304; Button v. Hoffman, 50 Am. Rep., 131; Briscoe v. Bank of Ky., 11 Pet., 323; Bank of Ky. v. Wistar, 3 Pet., 431.

6. Although one railroad owns or controls all the stock of another railroad, yet the former is not personally liable for the negligence of the latter. Cook on Stockholders, Sec. 6, note; Atchison R. R. Co. v. Cochran, 19 Am. Rep., 129; L. & N. R. R. Co. v. Howard, 15 Ky. Law Rep., 25; and other cases hereinbefore cited.

7. The judgment against the Louisville Gas Company, therefore, should be reversed, because it was simply a stockholder; and the refusal of the court below to render judgment against the Electric Light Company was "virtually a judgment in its favor," from

which no appeal has been prayed, so that the case should end here. 82 Ill., 281; 41 Ill., 405; Ashland R. R. Case, 94 Ky., 478.

8. If the court looks into the question of whether there was negligence on the part of the Gas Company, appellant, then the rule is, that "so many steam boilers explode from unknown and mysterious causes which can not, with confidence, be assigned to any known cause," that "the mere fact of the explosion is not evidence of negligence," and "the inference must be drawn from the explosion from some latent defect, not detected from usual and proper tests." Hough v. Austin, 15 Am. St. Rep., 613; Asbach v. Railway Co., 74 Ia., 250; Ency. of Law, vol. 7, p. 523; Ill. Cent. Ry. Co. v. Phillips, 49 Ill., 240.

9. The law "presumes" that the fireman who was killed, and the other employes of the defendant Electric Light Company were not negligent, but were performing their duty at the time. Hough v. Austin, 15 Am. St. Rep., 614.

10. Evidence of witnesses who simply "made examinations after the accident," is not a safe basis for a judgment. Indianapolis Ry. v. Toy, 33 Am. Rep., 57; Robinson v. Wright, 94 Mich., 283; Richmond R. R. Co. v. Elliott, 149 U. S., 271.

11. The defendant "is not bound to account for the happening of the accident;" and it is "erroneous to punish the defendant because it can not explain the cause of the explosion." Piehl v. Albany R. R. Co., 51 N. Y., Sup., 757; Sterns v. Ontario Co., 39 Atl. Rep., 292.

12. Applying the proper legal principles and precedents to the examination of the evidence of plaintiffs in this case, it fails to show any act of negligence on the part of the defendant Gas Company, which caused the explosion. See the following authorities, which are direct precedents: Indianapolis Ry. v. C. Toy, 33 Am. Rep., 57; Racine v. N. Y. Cent. R. R. Co., 24 N. Y. Supp., 388; Louisville R. R. Co. v. Lynch, 147 Ind., 165; Elliott on Railroads, Sec. 1299; Rice v. New York Steam Co., 128 N. Y., 103; Coshulick v. Standard Oil Co., 19 Am. St. Rep., 475; Hough v. Austin, 46 Ohio St., 386; Wheland v. Chicago R. R. Co., 85 Ia., 167; Day v. Lumber Co., 54 Minn., 522; Hughes v. Cincinnati R. R. Co., 91 Ky., 526.

13. The boilers were thoroughly inspected by the boiler inspection insurance companies and by the proper persons in behalf of the Electric Light Company. The company "is not required to dismantle complicated machinery for the purpose of inspection,

nor to keep on hand such mechanical contrivances, nor to employ such expert labor, as are required for the highest tests." Clyde v. Richmond R. R. Co., 65 Fed. Rep., 482; Richmond & Danville R. R. Co. v. Elliott, 149 U. S., 271; Elliott on Railroads, Sec. 1299; Hart v. Nomberg, 123 N. Y., 641; Coshulick v. Standard Oil Company, 19 Am. St. Rep., 475; Hough v. Austin, 15 Am. St. Rep., 613.

14. The plaintiffs' evidence being chiefly of conjectural guesses from persons who casually observed the boiler some days after the explosion, and who testified from memory several years afterwards, while the defendant's evidence is from persons who had charge of the boilers and testified from actual knowledge, there was a total failure of proof of negligence upon the part of the plaintiffs.

15. If the court should look into the question of the measure of damages, then the proof as to the amount of the goods for which the judgment was rendered, $212,481.60, was too indefinite, contradictory, and speculative to be the basis of a judgment.

16. The judgment for $10,000 for fixtures is shown to be excessive by the plaintiff's own evidence.

17. The damages, $2,649.51, of rent for another store, is too remote and outside the natural line of causation, to be the basis of a judgment. Shearman & Redfield on Negligence, Sec. 751; L. & N. R. R. Co. v. Teppenauer, 10 Ky. Law Rep., 401; Judas v. Fisher, 5 Ky. Law Rep., 768; Sedgwick on Damages, Secs. 113, 142, 153; Fox v. Poor Ridge, 8 Ky. Law Rep., 427; Western Union v. Smith, 83 Ky., 115.

18. The damages, $1,500, for loss of goods held in trust for customers and which plaintiffs allege they were "required to pay, and did pay," is not established by reliable evidence; and plaintiffs were not "required" to pay for them.

19. The damages, $1,300, for destruction of "credit-slips" and the failure of Kaufman's customers to come forward and pay their bills, is not definitely enough proven as to amounts, and is too remote and unexpected in law to be the basis of a recovery. Sutherland on Damages, vol. 1, pp. 48-55; Sedgwick on Damages, Secs. 143, 112, 123, 125, 127, 130.

20. The damages for $300 cash guessed to have been burned up is not sufficiently proven; and is too remote in the line of causation.

21. The item of $7,297.06, in so far as it embraces moneys paid to

employes to keep them from taking other employment until Kaufman should see fit to go into business again, is too remote in causation.

22. Where there is an "entire destruction" of the goods, the court proceeds on the theory that "the plaintiffs' entire interest in the property has ceased at the time of the injury and is replaced by a right to have the value of the property in money;" and, "the plaintiff having no longer title to the property," in contemplation of the law, can no longer claim that he might make a future gain from it; and therefore can not recover for future profits that he might have made. Sedgwick on Damages (8th ed.) vol. 1, Sec. 178; Shearman & Redfield on Negligence (4th ed.) Sec. 745; Erie City Iron Works v. Barbour, 51 Am. Rep., 508.

23. The speculative profits that plaintiffs might have made are too remote and uncertain. Cook v. Godshaw, 12 Bush, 319; Overman v. Nelson, 15 Ky. Law Rep., 92; Sedgwick on Damages, Sec. 153; Smith v. Phillips, 16 Ky. Law Rep., 615; Epenbaugh v. Gooch, 15 Ky. Law Rep., 576; Williams v. Wood, 55 Minn., 323; Bernard v. Poor, 21 Pick., 378.

24. The point made by plaintiffs, that the court must treat the finding of the lower court as the verdict of a jury, and only set it aside if palpably and flagrantly against the evidence does not apply here, but is only applicable to cases where there is "no issue properly cognizable in equity," and is a "purely legal question" presenting "legal issues alone." It has never been held applicable to equity cases. Woolley's Exr. v. Greenwade's heirs, decided by this court October 7, 1898; McCampbell v. McCampbell, 20 Ky. Law Rep., 552; Judge v. Braswell, 13 Bush, 737; Fraley v. Peter, 12 Bush, 470; Moore v. Estes, 7 Ky. Law Rep., 256.

25. Where a case is tried below, not by the common law method of bringing the witnesses before the court and jury, but by the chancery method of written depositions, so that the appellate court is at no disadvantage from not seeing the witnesses, the rule is, that the decision on the facts by one judge will be revised by the seven appellate judges, according to their own views of the evidence, and reversed if they believe it to be against the preponderance of the evidence. Whitmore v. Stout, 3 Dana, 27; Martin v. Brown, 4 Minn., 289; Powell on Appellate Procedure, 359; Catlin v. Hinton, 9 Wis., 495.

Louisville Gas Co. v. Kaufman, Straus & Co.

26. This is a case of which "equity has jurisdiction," because it is a subrogation case; and, "subrogation being the creature of equity has ever been administered by courts of equity." Harris on Subrogation, Sec. 6; Ency. of Law, vol. 24, p. 191; Allen v. Perrine, 20 Ky. Law Rep., 204; Hall v. Nashville R. R. Co., 13 Wallace, 367; Insurance Company v. Railroad Co., 65 Am. Dec., 576.

27. This was also an equity case, because, under Sec. 10 of the Civil Code as amended in 1890, it "involves questions so complicated and of such great details of fact as render it impracticable for a jury to intelligently try the case." Ky. Code, Sec. 10 (ed. of 1895); O'Connor & McCullough v. Henderson Bridge Co., 95 Ky., 641; Newcomb v. Cincinnati, &c., Ins. Co., 10 Am. Rep., 746.

28. A court of equity at the urgent solicitation of plaintiffs having acquired jurisdiction over the subject, it was the duty of the court to proceed and do final and complete justice between the parties, where it could be done as well in the court of equity as in the law court; and, in so doing, it may decree on matters which have been cognizable at law; and it is thereby none the less an equity case. Story's Eq. Jur., Sec. 546; Taylor v. Merchants Ins. Co., 9 How., 405; Ober v. Gallagher, 93 U. S., 206; Kennedy v. Creswell, 101 U. S., 646.

29. To succeed, the plaintiffs must establish from the evidence, first, that the boiler did in fact explode from some act of negligence, which act must be definitely pointed out; second, the person who was guilty of negligence must be pointed out, and it must be shown that he was in the employ of the Louisville Gas Company. Plaintiff's evidence made a total failure on both points.

W. S. PRYOR, ON THE SAME SIDE.

1. Kaufman, Straus & Company are not entitled to recover in this action because their loss has been more than repaid them by the insurance companies.

2. The burden of proof was on the insurance companies to establish their equity and their evidence fails to show any negligence on the part of the employes of the Electric Light Company.

3. The insurance companies are entitled to recover only upon the principle of subrogation and the "principle of subrogation is one of equity merely and will be carried out in the exercise of a proper equitable discretion." Sheldon on Subrogation, p. 5.

WM. LINDSAY for Kaufman, Straus & Co.

1. The relationship of the Gas Company to the Electric Light Company was such that the negligence of the latter created a cause of action against the former. The Gas Company was furnishing electric light through the instrumentality of an organization entirely within its control. Buckeye Marble & Freestone Co. v. Harvey, 20 S. W. R., 426; Louisville Banking Co. v. Eisenman, 93 Ky., 83; Geo. T. Stagg Co. v. Taylor, &c., 95 Ky., 651. Besides the evidence shows that the Gas Company purchased the plant of the Electric Light Company and operated it.

2. The evidence shows that the accident resulted from the negligence of those in charge of the exploded boiler.

A. S. BRANDEIS for Kaufman, Straus & Co., (WM. LINDSAY, BRIGHT & BRANDEIS, of counsel.)

1. The boiler which exploded was the property of the Gas Company because it was a part of the assets or plant purchased by it of the Electric Light Company and was operated by the Gas Company at the time of the explosion.

2. The Gas Company had no power to buy or hold stock in the Electric Light Company except to the end that it might manufacture, sell and distribute electricity and that such ownership was necessary or convenient to its business of electric-lighting. Charter amendment, Act. of May 3, 1890; Marbury v. Kentucky Union Land Co., 62 Fed. Rep., 342; Central Transportation Co. v. Pullman Car Co., 139 U. S., 48.

3. It had no power to buy or hold the stock as an investment or to exercise a control over the business of the Electric Light Company, or to suppress competition, or to buy electricity advantageously from the Electric Light Company, or for any other purpose than that specified in the legislative grant. And it will be presumed to have acquired the stock for the only purpose authorized by its charter. 4 Thompson on Corporations, Sec. 5967; Lynderborough Glass Co. v. Mass. Glass Co., 111 Mass., 315; Getty v. Barnes Milling Co., 40 Ks., 281; Chautauqua Co. Bank v. Risley, 19 N. Y., 369; Master's Exr. v. Blinker, 87 Ky., 1; Central Transportation Co. v. Pullman Car Co., 139 U. S., 48.

4. The fact that the Gas Company bought and held at the time of the explosion the entire capital stock of the Electric Light Company, a corporation organized under the General Statutes, worked a suspension of the "rights under the franchise" of the

latter corporation, and rendered the sole stockholder liable for whatever liabilities might arise out of the use of the corporate property. Louisville Banking Co. v. Eisenman, 94 Ky., 83; Swift v. Smith, 65 Md., 428; Potts v. Schumaker, 84 Md., 535; Trustees for Vincennes University v. Indiana, 14 How., 273; Phillips v. Wickham, 1 Paige, 596; Thompson on Corporations, Sec. 5096; Stagg, &c., v. Taylor, &c., 95 Ky., 651; Cohen v. Ripy, 17 Ky. Law Rep., 1078; Genl. Stat., chap. 56, Sec. 2.

5. Nor does the fact that the Gas Company, though retaining the ownership of the entire capital stock, placed in the names of its own directors shares for the sole purpose of qualifying them to serve as directors of the Electric Light Company, change the responsibility resting on the Gas Company as sole stockholder; it gained all the profits of the enterprise and will be held to its losses; and the directors had no beneficial interest therein; the transfers of stock to them were not made in good faith within the meaning of the construction of the General Statutes. Stagg &c. v. Taylor, &c., 95 Ky., 651; Smith v. San Francisco Ry. Co , 115 Cal., 584; Stanley v. Kellar, 86 Ky., 240; American & Eng. Ency. of Law, vol. 8, p. 1361; Ware v. Hylton, 3 Dall., 241; Anthony v. American Glucose Co., 146 N. Y., 412; Glidden & Joy Co. v. Interstate National Bank, 69 Fed. Rep., 918.

6. The rule that a stockholder in a corporation, though he may own a controlling interest, is not personally liable for corporate acts, has no application where the corporation is one created under the General Statutes and the stockholders own all the shares. Louisville Banking Co. v. Eisenman, 94 Ky., 83; Stagg, &c. v. Taylor, &c., 95 Ky., 651.

7. The Gas Company, in the operation of its electric light plant in the heart of the city of Louisville, in the immediate vicinity of valuable buildings and other property, was under an obligation to the owners thereof to exercise that degree of care and skill which prudent men would have exercised under like circumstances. Heaven v. Pender, L. R. 11 Q. B. D., 503; Wabash, &c., R. R. Co. v. Locke, 112 Ind., 404; 2 Am. St. Rep., 197; L. & N. R. R. Co. v. McCoy, 81 Ky., 403; Shearman & Redfield on Negligence, Sec. 3; Parrott v. Wells, 15 Wallace, 524.

8. The Gas Company failed to exercise that degree of care and skill in the operation of its plant required under the circumstances.

9. Explosions of steam-boilers are generally not due to mysterious causes. "The mysterious explosions constitute the exceptions,"

and "as a rule the cause of an explosion can be told." Ills. Cent. R. R. Co. v. Phillips, 55 Ill., 198.

10. An explosion due to a latent defect can always be explained, else even after the explosion the defect would remain unknown. Indianapolis, &c., Ry. Co. v. Toy, 91 Ill., 474; 33 Am. Rep., 57.

11. That the boiler exploded because of lowness of water is proved by its physical appearance after the explosion, presenting lines, color, and shape known to steam-users as certain indications of lowness of water.

12. The rule that the burden of proving negligence is on the plaintiff and that he must fail, if the evidence is equally consistent with the existence or non-existence of negligence, has no application here, because there is no evidence of any other cause than lowness of water. Hughes v. Cincinnati, &c., R. R. Co., 91 Ky., 526; Taylor v. Yonkers, 105 N. Y., 208; Wheelan v. R. R. Co., 52 N. W. R., 119; Asbach v. Railway Co., 74 Iowa, 250.

13. The judgment, allowing a recovery for the value of the merchandise, fixtures and other property destroyed, involves only the question of the weight of the evidence and presents no disputed question of law.

14. The damages for excess of rent paid for the use of another store-house are a proper recovery as a reasonable expenditure in reduction of the damage sustained by the destruction of appellees' store-house and the interruption of their established business; otherwise, they might have been supine and inactive, and, remaining out of business until their store could have been rebuilt, have recovered for the entire period of suspension. Sedgwick on Damages, Secs. 215, 221; Am. & Eng. Ency. of Law, vol. 8, p. 605, (2d ed.)

15. The damages allowed for goods held in trust for customers constitute a proper recovery; since a bailee with the possession and right of possession, has the right of action against a wrongdoer for the entire value, holding the excess in trust for his bailor. Am. & Eng. Ency. of Law (2d ed.) vol. 3, p. 761; Addison on Torts, vol. 1, p. 443; Sec. 524; Robinson v. Webb, 11 Bush, 483; 1 Chitty on Pleading, p. 151; Belt Electric Line Co. v. Creason, 14 Ky. Law Rep., 203; Lawson's Rights and Remedies, vol. 4, p. 2972.

16. And it is immaterial whether the bailee "had to pay" or "did pay" the bailor, for he has a right of action in either case. Same authorities.

17. "Loss of profits," suffered through the destruction of or injury to an established business, produced by wrongful destruction of one's place of business, is a proper element of damage, provided it can be shown with reasonable certainty that the profits would have been earned. Am. & Eng. Ency. of Law (2d ed.) vol. 8, p. 625; Goebel v. Hough, 26 Minn., 252; Terre Haute v. Hudnut, 112 Ind., 542; Gibson v. Fischer, &c., 68 Iowa, 29; Kirby v. Chapman, 49 Ill., 211; Allison v. Chandler, 11 Mich., 542; Sedgwick on Damages, Sec. 178; Shearman & Redfield on Negligence (5th ed.) Sec. 744.

18. In such case, the history of the established business for a reasonable time prior to the period of interruption, together with the conditions surrounding the business at the time of the interruption will show to a reasonable certainty what profits have been prevented by the interruption. Same authorities as above. Also, Koch v. Godshaw, 12 Bush, 319; Smith v. Phillips, 16 Ky. Law Rep., 615.

19. Such profits are not speculative or remote. Same authorities.

20. A recovery for the loss of the goods, whether partially or entirely destroyed, does not preclude a recovery for the interruption of an established business by destruction of the storehouse. That is "another proximate loss" for which additional recovery may be had. Same authorities. Also, Sewalls' Fall Bridge v. Fisk, 3 Foster (N. H.) 171; Sedgwick on Damages, Sec. 178.

21. All the issues of fact in this case are legal issues and not "properly cognizable in equity," nor is a "purely equitable question" presented; and the finding of the lower court will be treated as the verdict of a properly instructed jury, and will not be set aside unless it is flagrantly and palpably against the evidence. Pittsburg, &c., R. R. Co. v. Woolley, 12 Bush, 451; Fraley v. Peters, 12 Bush, 469; Judge v. Braswell, 13 Bush, 67; Davidson v. Morrison, 86 Ky., 397; Plum v. Mitchell, 26 S. W. R., 391.

22. It is only where there are "purely equitable issues," or where there are "issues properly cognizable in equity" that a different rule of practice prevails in cases tried by the court without a jury. Deshazer v. Deshazer, 11 S. W. R., 772; Farmers Bank v. Stapp, 97 Ky., 435; McCampbell v. McCampbell, 20 Ky. Law Rep., 552; Woolley's Exr. v. Greenwade's Heirs, 20 Ky. Law Rep., 624.

23. There is no question of subrogation in the present case; nor can there be such question between Kaufman, Straus & Co., in whose favor the judgment was rendered, and the Gas Company, appellant herein.

SIMRALL, BODLEY & DOOLAN FOR APPELLEES, SUNDRY INSURANCE COMPANIES. (KNOTT & EDELEN AND BERNARD FLEXNER, OF COUNSEL.)

1. The evidence shows that the boiler was exploded by reason of negligence.
2. The Gas Company did, as the petition alleges, own and operate the boiler through its agents, servants and employes. Under this head it will be noticed first, that the Gas Company had no charter power to buy the stock of the Electric Light Company except to the end of conducting its own electric lighting business. Its purchase of all the stock suspended the corporate franchise of the Electric Light Company and made the Gas Company responsible for the acts done under the name of the suspended company. Louisville Banking Co. v. Eisenman, 94 Ky., 83; Geo. T. Stagg Co. v. Taylor Co., 95 Ky., 651; second, the Gas Company intended to buy and operate the latter company's plant; and third, did in fact buy that plant.
3. The finding by the chancellor of the negligence, even though the evidence be conflicting, will not be disturbed by this court.

KNOTT & EDELEN, FOR SUNDRY INSURANCE COMPANIES, APPELLEES.

1. The amendment to the charter of the Louisville Gas Company contemplated the purchase by that company of a plant for the manufacture, distribution and sale of electricity and not the ownership of stock in other corporations as an investment.
2. The acquisition of the entire capital stock of the Electric Light Company made the Gas Company the equitable owner of the plant of that company, and it is liable for the negligent use or operation of that plant.
   . Citations:  Eisenman v. Louisville Banking Co., 94 Ky., 83; Geo. T. Stagg Co. v. Taylor Co., 95 Ky., 651; York & Maryland Ry Co. v. Winans, 17 How., 30; Thompson on Corporations, Secs. 1102, 6603; Morawetz on Corporations, Secs. 431-3; Chicago Gas Trust case, 130 Ill., 268.

Louisville Gas Co. v. Kaufman, Straus & Co.

BRIGHT & BRANDEIS, SIMRALL & DOOLAN, BODLEY, BASKIN
& MORANCY FOR APPELLEES, IN A PETITION FOR A REHEARING.
(WM. LINDSAY AND KNOTT & EDELEN, OF COUNSEL.)

T. L. EDELEN IN A SEPARATE PETITION FOR A REHEARING.   (SIM-
RALL, BODLEY & DOOLAN, BERNARD FLEXNER, KNOTT
& EDELEN, OF COUNSEL.)

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

At about 5 o'clock on the evening of October 26, 1891,
one of the boilers of the Louisville Electric Light Com-
pany exploded, and caused the destruction, by fire, of the
wholesale and retail dry-goods and dress-making estab-
lishment of Kaufman, Straus & Co., situated across an
alley in the vicinity of the electric plant.   While there
were other persons in the room adjoining the boiler room,
there was only one person immediately at the boiler when
the explosion occurred; and that person was the fireman
Adams, who was killed by the explosion.   Some months
after the destruction of the establishment, Kaufman,
Straus & Co., having been paid in the meantime the sum
of $195,500 on account of some 60-odd policies of insurance
held by them, but which they averred did not fully cover
the real value of the goods and other losses, brought this
action, in Law and Equity Division of the Jefferson circuit
court (equity side), to recover in their own right, and in
behalf of the insurance companies (some of whom were
made co-plaintiffs and others defendants), the aggregate
sum of $242,557.72, against the electric light company
and the Louisville Gas Company; it being averred that the
latter company was the real owner of the former compa-
ny, and was in fact operating the electric plant at the time
of the explosion.   The insurance companies which had
been made defendants came in by answer, counterclaim,
and cross petition, and in effect joined in the suit with

the plaintiffs. On the issues joined, by a traverse of the averments of the pleadings, after elaborate preparation by the parties, the chancellor held that the explosion was the result of low water, permitted through the negligence on the part of the gas company, its agents and employes, which company was held to be the real owner and operator of the electric light company. He thereupon rendered judgment against the gas company, and against it alone, for the sum of $231,000, of which about the sum of $219,000 was for the benefit of the insurance companies. The gas company appeals, insisting that, although it had bought all the stock of the electric light company, that company's organization remained intact, and that corporation was in fact still operating the electric plant under its separate board of directors and other officers; and, moreover, that upon the state of case shown by the proof, the plaintiffs are not entitled to recover, it not being established that the explosion was caused by negligence; and especially the plaintiffs ought not to recover because their own proof as to the .cause of the explosion is contradictory and destructive of itself. It also insists that Kaufman, Straus & Co. have already collected largely more than the actual value of their goods, because they returned that value, on oath, to the assessor, at $70,000 only, as of some thirty days before the explosion.

Waiving the question at present as to the ownership of the electric plant, and the responsibility for the explosion on this ground, we shall proceed to consider briefly the facts relied on to show negligence. In the boiler room there were seven boilers, No. 7, the one that exploded, being situated next to the alley on the other side of which the rear end of the storehouse of Kaufman, Straus & Co. was situated. This boiler was connected with its mate,

No. 6, by a small pipe extending beneath, which was used as a blow pipe, and which also served to maintain the same water level in the two boilers. They were fed with water, however, by independent feed pumps. It is agreed that the boiler in controversy was outwardly, at least, in good condition and safe, although it had been in use since 1883. The witness Noble (the plaintiffs' witness) proves that the boilers "were inspected about thirty days before that (the explosion), and pronounced first class;" that he considered the boiler that exploded first class; that the electric light company made it a rule to have its boilers inspected regularly, and the reports of the inspectors were to the effect that these two boilers, 6 and 7, were in first class condition. The proof is clear that, up to the time of the explosion, the conditions were such as usually surround the prudent and careful operation of steam boilers, unless indeed, the fireman Adams had neglected to keep up the water supply in No. 7; and the plaintiffs' case rests on the affirmation that he had so failed.

We have not failed to read and give due weight to the proof in criticism of the size of the blow pipe, called also the "equalizing pipe," and the occasional defects in the feed pumps. But the fact is shown by the plaintiffs' own testimony that, on the day of the explosion, "the boilers equalized pretty well," and the blow pipe was in good order at 3 o'clock, when the fireman, Adams' predecessor, went off duty; nor was there any difficulty then in feeding the boilers. Noble also testifies: "If a man had come to me ten minutes before I went off watch (some $2\frac{1}{2}$ hours before the explosion), and asked me if I was afraid of the boiler, I would say that I would risk 130 pounds of steam on it. They were running 115 pounds when I went off

[10]

duty. We were allowed to carry 118 pounds." It is therefore a case of negligence from lowness of water, or no case at all. This is aptly stated by appellees' counsel thus: "If appellees have not shown, as was found by the lower court, that *lowness of water* in the boiler was the active, efficient cause of the explosion, then they have shown none at all." The time fixed by Adams' predecessor when he went off duty is about as near to the explosion as the plaintiffs' witnesses bring us. The testimony of two witnesses for the defendants discloses the fact that, three or four minutes before the explosion, the fireman Adams was at his post of duty, and everything was running smoothly, and that they heard Adams, while in front of the boilers 6 and 7, test his water, and the gauge showed the usual sign of water. But we are at the present considering the testimony of the plaintiffs, and are therefore brought this side of the explosion, to examine the testimony upon which is based the claim of low water.

The testimony of two witnesses, and two only, out of a large number introduced by plaintiffs who had the same advantages in examining the wreck as these two had, is to the effect that after the explosion there was a distinct water line across the boiler at the level of the lower one-third of the flue, convincing the witnesses that, at the time of the explosion, the part above the water line had been red hot, and the part below had been protected by the water. This is formidable proof, and seemingly conduces strongly to show the lack of water at the time of the explosion. But the force of it is greatly weakened, if not destroyed, when we find that the other experts and practical boiler men introduced by the plaintiffs, and who made careful examination of these same flues, do not speak at all of this "distinct water line," or of any sign of that

character. And several of them testify to facts wholly inconsistent with the existence and presence of such a line. Thus C. G. Curry says the boiler had the appearance at the time of the explosion of being dry; that there was not a hatful of water in it. This is certainly inconsistent with the theory that the water level was at the lower third of the flue. It is true both McDonald and Curry attribute the explosion to low water. But McDonald only does so because of the "distinct water line;" and, in effect, Curry says there was no such line on the exploded boiler, though he says there was such line on the unexploded boiler. There certainly could have been no such line on the exploded boiler if he is to be believed, nor there could hardly have been such line without the other experts of the plaintiffs seeing it. If we discard, however, the testimony of these two witnesses, as not being supported by the other witnesses of the plaintiffs, and as being in effect contradicted by them, still some of these others express the opinion that low water caused the explosion. When examined carefully, however, the grounds of their belief will be found vague and unsatisfactory. Thus, Noble says: "Generally, lack of water causes an explosion, and pumping cold water into the hot boiler. *Nothing else that I know of caused it.*" Manifestly, he attributes this explosion to low water because he knows of nothing else that caused it. This amounts to little more than a guess at the cause. Again, C. G. Curry says: "*I should judge* that the boiler had been improperly looked after, and the water allowed to run low or run out altogether. The boiler became very hot, and then water was allowed to suddenly go into the boiler, causing the explosion."

Against these opinions and problematical speculations,

the plaintiffs introduce other experts, equally skilled and competent to ascertain the cause of this explosion, and who examined the wreck presumably with equal fidelity and conscientiousness; and they frankly declare they are unable to say from their examination what caused the explosion, or to give an opinion with respect thereto. Thus, W. B. Grubbs, who was special agent for the Employers' Liability Corporation of London, says that, in discharge of his duty as representative of his corporation, he went to the scene of the wreck, the day of the explosion, and on three separate days, and made an examination of the "burst boiler, to ascertain, if possible, if low water caused the explosion." He finished his examination without being able to come to any conclusion as to the cause of the explosion; not only so, he fails to venture even an opinion or impression as to the cause.

The difficulty we have in coming to any satisfactory conclusion as to the cause of the explosion, growing out of the fact that those learned in the business at hand come to different conclusions from the same data, is still further increased when we examine the testimony of perhaps the most distinguished expert introduced by the plaintiffs. Prof. Brown, who, as plaintiff shows, is professor of steam engineering and machine design in the Rose Polytechnic Institute of Terre Haute, Ind., and who was educated at the Sheffield Scientific School of Yale University, testifies substantially that, at the instance of the plaintiffs, he tested certain parts of the exploded boiler, "to determine the strength of the material, its elastic limit, its ductility, and its thickness," making four separate tests. The thickness was .2375 of an inch. The tensile strength was 42,900 pounds per square inch of section. He found an elastic limit of 22,103 pounds per square inch of section of elastic

limit of  51½ per cent. of the breaking strength, and a mean elongation of 3.7 per cent.

The importance of these tests will be shown better by a quotation from the testimony of this witness, as continued by the plaintiffs:

"(21) I will ask you to state whether or not the examinations and tests to which you submitted these specimens were or not thorough and exhaustive.  A. They were thorough and exhaustive.  (22) If it be a fact that the original tensile strength of the iron constituting the boiler which exploded, and which is the basis of this litgation, was 55,000 pounds, and your examination of a part of it showed the tensile strength 42,900, what do those two facts indicate with reference to the condition of the boiler at the time the explosion took place?  A. This indicates that a serious deterioration, or a very marked deterioration, had occurred in the quality of the material.  (23) Does or does not the elongation percentage of three and seven-tenths indicate anything with reference to the condition of the iron which you examined?  A. It indicates that the material had been stretched as far or nearly to its limit, and that its elasticity and resilience had been almost entirely eliminated.  (24) If the boiler, of which parts thus examined by you, was originally one-quarter of an inch in thickness, and had a tensile strength of fifty-five thousand pounds, and the piece of iron which you subjected to examination was a part of that boiler, which had been used for about eight years, during which most of this time river water had been used in it, and at the end of which time an explosion of the boiler took place, how would you, if at all, explain that material deterioration in the quality of the iron which you have stated to be the result of your examination?  A. I should say that, in the first place, the

deterioration which it showed in tensile strength had been caused by repeated and long-continued heating of the material, in which physical changes had taken place, result- ing in a material reduction in strength; that its lack of resilience or elasticity was due to excessive heavy pres- sures produced on it, or stress produced in it, by heavy steam pressure, or by contraction and expansion of the material, due to changes of temperature, or those causes combined.   The reduction in thickness resulted, doubtless, from the corrosive action of the water, or of the fire, or the erosive action from the same causes.   (25) Would or not a boiler of which the specimen examined by you was a part have been as strong as the same boiler when its tensile strength was fifty-five thousand pounds, and the thickness of it one-quarter of an inch?   A. It would not.   (26) Would the boiler of which that specimen was a part have been able to support a pressure of steam as great as the same boiler when its tensile strength was fifty- five thousand pounds, and its thickness one-quarter of an inch?   A. It would not.   (27) Would that difference make a material or immaterial difference?   A. It would be marked.   (28) I will ask you whether or not the owner or manager of the boiler of which that specimen examined by you was a part could, by the exercise of ordinary dili- gence, have known of its condition at any time.   A. He could have known that it was weaker than when originally built, and unable to withstand the wearing pressure to which it had originally been subjected.   (29) Could or could not he have known exactly what its tensile strength at that time was?   A. He could, by testing a portion of it. (30) But, by ordinary inspection, he could not?   A. He could not.   (31) How far would he have known its condi- tion?   A. That is a question which would be very difficult

Louisville Gas Co. v. Kaufman, Straus & Co.

to answer exactly. (32) If the boiler of which the speci-
men examined by you was a part was a flue boiler, twenty-
four feet long, and forty-two inches in diameter, and was
ordinarily subjected to a steam pressure of from 110 to
115 pounds, would you not consider such a pressure a safe
working pressure for that boiler? A. I would not. (33)
If the boiler mentioned had been ordinarily subjected to
a working pressure of from 110 to 115 pounds, what, in
your opinion, would be the effect upon its condition, and
its ability to withstand any impulsive blows or other
trifling accidents? A. I do not catch the meaning of that
question. (34) I will put it in another form: If the boiler
above mentioned was ordinarily subjected to a pressure of
from 110 to .115 pounds, would that fact in any manner en-
hance the risk of operating that boiler? A. It certainly
would.     (35) Please explain fully how that would have
been brought about. A. While a boiler under ordinary con-
ditions might withstand for a considerable period a pres-
sure of from 110 to 115 pounds per square inch, there
are causes which at times operate to increase the stresses
produced by such steam pressures to a very considerable
amount; as, for instance, if at any time the boilers are mo-
mentarily—the water in the boiler is quiet—that is, if no
steam is being drawn off from the water, and if suddenly
a valve is opened, or an opening made in any manner for
the escape of steam, as by opening the valve to start the
engine, or by the opening of the safety valve, the sudden
formation of the steam is likely to occur in the water in
the boiler, which formation will possibly or is likely to
throw a large mass of water towards the opening of the
boiler, and against the boiler plates, thus producing a
blow, or impact, which greatly increases the stress on the
material. (36) What effect would such occurrence have

upon the boiler plates? A. If the boiler plates were weak, it would be very likely to rupture them. (37) Would or not such occurrence be likely to produce an explosion? A. It would. (38) Are there any otherwise trifling occurrences in boiler management that would, under some circumstances, produce similar results? A. That is, resulting in an explosion or laceration of the shell? (39) Yes. A. I presume there are many. (40) With a boiler in the condition stated, would or not otherwise trifling and unimportant occurrences tend to become serious? A. You mean a boiler of such thickness and under such pressure? (41) Yes. A. Do you mean, are there other trifling causes which might produce such results? (42) Yes. A. There are. (43) Enumerate some of them. A. It might be possible that a boiler which was loaded with an excessive steam pressure, and had an accumulation of scale in one part, and perhaps heated exclusively at that point, due to the non-conducting quality of the scale, if that scale should be loosened by the permeating of the scale by the water in the formation of steam, undoubtedly such cause might produce explosion by the formation by the large amount of steam and the increased pressure due to such formation. (44) State any other ordinary occurrence in boiler management which might have such effect. A. It might be possible, if a boiler were loaded excessively, that the opening of the furnace door and the sudden influx of a current of cold air might produce such contraction in the material of the plate being cooled as to cause a rupture of the shell. (45) Any other? A. If the water in the boiler is allowed to become very low, and cold water were pumped into the boiler onto very hot plates, the formation of steam in such a case might produce such excessive stress as to burst the boiler. (46) As to cause an explosion? A. As to cause

an explosion.   (47) I will ask you whether or not a working pressure of from 110 to 115 pounds upon the boiler of which the specimens examined by you that day were a part, and which was 24 feet long and 42 inches in diameter, had been used about eight years, part of the time with river water, was a safe load for it to carry?   A.   It was not (48) What, in your opinion, would have been the limit of pressure for ordinary safety in such a boiler in the condition in which you found the specimens examined?   A. I should consider such a boiler fit for the scrap heap; it should be discarded.   (49) Give, if you can, your reasons for such a conclusion, and give them as fully as you please. A. My reasons are that the result of my investigation showed the material to be reduced in tensile strength, and almost entirely lacking in resilience, or the power to resist impulsive load; and, in consequence, it would, in my opinion, be unfit for further use in boiler construction.   (50) Do I understand, in your opinion, the operation of such a boiler under a pressure of 110 to 115 pounds was in any event unsafe, and likely to result in an explosion?   A.   It was.   (51)   That is your opinion?   A.   It is. (52) If it be a fact that, after the explosion of the boiler of which this iron examined by you was a part, there appears on the inner side of the shell certain bluish marks at a height at or very slightly above the lower part of the flue, would or not such a fact indicate anything with reference to the height of the water at the time of the explosion? (Question objected to, because no facts in this record disclose any ground upon which to base the hypothetical case.) A. I should first endeavor to determine what those bluish marks or tints were caused by.   If, on inspection, it was demonstrated to be oxide of iron, such as is ordinarily formed by the action of the air, or oxygen on the heated

surface of iron, or the action of superheated stem upon such a surface, I should consider that such a surface was not covered or protected by water, and if a distinct line appeared horizontally about the boiler, above which line the surface of the material was coated by this iron oxide, I should conclude that the level of the water had been below the surface so coated, and that the water had not been in contact with it.    (53) To what other cause than such oxidation could such a blue line or tint owe its origin?   A. A tint of that sort would possibly be produced by smoke, but such a tint or color could be easily determined by careful inspection by one who was familiar with the color and characteristics of oxide of iron.   (54) If due to smoke, they could be easily detected?   A. Yes; and probably wiped off. (55) If, then, such a blue mark or line were due to oxidation, and not to smoke, you would conclude that it marked the height of the water at the time of the explosion that might have taken place; is that correct?   A. I should conclude that at the time of oxidation the water could not have covered that surface.    (56) If such an appearance presented itself on the inner side of the shell of the boiler that had exploded, would it then, or not, indicate the line above which no water had been immediately previous to the explosion?   A. I can not say that the coloring might not have been formed previous to twenty-four hours before such an explosion.    (57) If such coloring had been produced, and the height of the water in the boiler had afterwards been raised above it, would such color be permanent, or would it disappear?   A. It would probably not be obliterated for some time, but no ordinary boiler would stand the pressure produced by such an operation.   (58) If a boiler with the dimensions we have mentioned, and of which specimens examined by you had been customarily

subjected from 110 to 115 pounds, why would it have been dangerous to operate it?    A. Because the material was too weak to withstand the stresses which such a pressure would produce safely.  (59) What could, in such a case, have produced the explosion of such a boiler?    A. Any one of numerous trifling causes, a few ·of which I have enumerated, might have caused an increased stress in the material as to produce a rupture.    (60) What are your duties at the Rose Polytechnic Institute?    A. Teaching machine designing; designing machinery and steam engineering, both in practice and theory.  (61) How long have you been so engaged?    A. Since 1888.  (62) What sort of machinery, if any, did you use to make the examination of that specimen?    A. I used a Riehle testing machine."

Giving full credence to all the evidence introduced by the plaintiffs, we conclude that they have rendered it quite likely or probable that low water caused the explosion; and they have also made it probable that the cause is unascertainable; and they have demonstrated to a certainty that the reduction in the thickness of the exploded boiler, and the deterioration which the boiler showed in tensile strength, had been caused by *repeated and long-continued heating of the material during the eight years of its service*, and during which physical changes had taken place, resulting in a material reduction in strength, and that this lack of tensile strength, elasticity, and resilience was unobservable and unknowable except by breaking the boiler into pieces, and testing the parts; and, moreover, in the weakened condition in which the boiler was when it exploded, they have shown conclusively that a half dozen causes other than low water might easily have produced the explosion.  Indeed, they have demonstrated almost beyond a reasonable doubt—and quite beyond such doubt

if Prof. Brown is to be taken at his· word—that, however abundant the water supply, the *necessary* result of putting a pressure of 110 pounds of steam on the boiler, in its weakened condition, from long use and continued heating, and quite independent of this supply, was to cause the explosion. If putting on this pressure was itself negligence, or the use of the boiler in its weakened condition was negligence, then the case is made out; but no such contention is made, and can not be in the face of the evidence of plaintiff's witnesses showing regular inspection of the boiler, which authorized the belief that such amount of pressure was sustainable without danger. The plaintiffs therefore have established with reasonable certainty that a non-negligent action by the fireman caused the explosion; but not only so, they have weakened other testimony introduced by them conducing to show lack of water, by explaining the presence of the alleged water line. These lines are shown to have resulted possibly by the action of overheated steam or smoke, and were not, therefore, necessarily attributable to low water. That they were in fact caused by smoke or steam is made probable, if not certain, from the fact that, when so caused, they soon disappear; and they did disappear in this instance, because only two witnesses saw them, out of a dozen men who examined the wreck.

Upon the state of facts thus presented by the plaintiffs, the question before us is, not whether the finding of the court is with or against the evidence, or is flagrantly against the evidence, but the question is whether the law will authorize a verdict on the problematical data and the uncertain and shifting foundations thus laid by the plaintiffs. When the question is one of negligence or no negligence, it is well-settled law that, where the evidence is

equally consistent with either view—the existence or non-existence of negligence—the court should not submit the case to the jury, for the party affirming the negligence has failed to prove it.    Thomp. Neg. p. 364.    This court, citing this authority, held in Hughes v. Railroad Co., 91 Ky., 526, [16 S. W., 275], that, in an action to recover for injury arising from defendant's negligence, the burden of showing negligence is on the plaintiff; and if the evidence shows that the injury may have resulted from either one of two or more causes, only one of which was due to defendant's negligence, and the inference that the injury resulted from the one cause is no stronger than that it resulted from the other, the plaintiff has failed to make out his case, and the jury should be so told.    In Wintuska's Adm'r v. Railroad Co. (Ky.), 14 R., 579 [20 S. W., 819], where it was claimed that a brakeman found lying on the track had come in contact with a ledge of rocks negligently left too close to the track, this court held that a peremptory instruction ought to have gone on the ground that, while there was a likelihood he was struck by the rocks, yet it was equally as likely that he had become dizzy or stumbled in the dark. In Grant v. Railroad Co., 133 N. Y., 658, 31 N. E., 220, the same rule is thus declared: "Where there are two or more plausible causes for an injury, for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by the evidence that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in the case leaves it *just as probable* that the injury was the result of one cause as of the other, the plaintiff can not recover."    It is well known that, in a great number of cases of boiler explosions, the cause is unknown, and remains unknown in spite of the most searching investigation.    As said in Huff

v. Austin, 46 Ohio St., 386 [21 N. E., 864; 15 Am. St. R., 613]: "Instances are not infrequent of steam boiler explosions where there has been no want of ordinary care and skill in their management, and even when there has been the greatest care; and explosions of steam boilers have happened of so mysterious a character that they could not with confidence be assigned to any known cause."

The application or adjustment of these familar principles of law to the facts of this case, as presented by the plaintiffs, impels us to sum up the situation thus: It is fairly inferable from certain of the plaintiffs' testimony that low water caused the explosion; it is also fairly to be inferred from other of the plaintiffs' testimony that the cause was not ascertainable after careful examination; and, lastly, it is shown with reasonable certainty, upon the only scientific test and examination made, that the boiler was inherently weak, from physical changes occurring secretly, through long use, and which were not discoverable by ordinary and usual inspection, and that the explosion almost necessarily followed from the subjection of the boiler to the usual amount of pressure required in its customary operation. We conclude, therefore, that the evidence is not sufficient to authorize a judgment transferring the money or property of the defendants to the possession and profit of the plaintiffs. It is hardly necessary to say that this conclusion is fully sustained and fortified by abundant proof on the part of the defendants, showing careful and prudent management of the boiler and machinery, and that the explosion was not the result of negligence.

By reason of the view already expressed, the question of the gas company's liability, because of its ownership of the light company's stock, becomes unimportant. However,

we are inclined to the opinion that there is nothing in this case to take it out of the general rule, laid down without exception by all the authorities, that ownership of all the stock by a single stockholder does not operate as a dissolution of the corporation, nor impose additional or different liability on the single stockholder than the law imposes on the stockholders generally when the stock is held by a number of persons. No reason has been suggested why the rule should not be the same. It was said by this court in Louisville Banking Co. v. Eisenman, 94 Ky., 93 [21 S. W., 534], that "the elementary writers on the subject all concur in holding that the fact of one person becoming the owner of all the shares of stock does not work a dissolution of the corporation." In that case, however, the single shareholder had abandoned all effort to keep up the organization, and proceeded to use and control the property as his individual property. The court said, therefore: "It must be held that the purchase by one of all the shares in a corporation created under our statute is a dissolution of the corporation to the extent that it suspends the exercise of the rights under the franchise until the owner transfers the stock in good faith, so as to maintain an organization under the statute." Now, it is well settled that an organization may be maintained, and maintained in good faith, by a board of directors who may have acquired their stock by gift, or who may even hold the stock in trust for another. Mr. Cook says: "A stockholder may have purchased stock with a view of becoming a director, or may have obtained it by gift, or he may hold it upon a trust, and be qualified to be a director." 1 Cook, Stock and Stockholders, note to section 623; In re St. Lawrence Steamboat Co., 44 N. J. Law, 529. These principles apply universally when the question is one involving simply the life—the being—of

the corporation, and the right to exercise its franchise in good faith. It is needless to say they do not apply when the organization is attempted to be kept alive as a mere shield for wrongdoing, or for the perpetration of fraud. There is no hint here that the gas company is attempting to use the other corporation as a cloak for wrongdoing. The business of the light company has proceeded as it did before the various stockholders sold their shares to the gas company. The public has continued to deal with the regular board of directors of the light company, and that company has retained its own officers and employes, its own pay rolls, and its own franchise property and plant. There has been no conveyance of any franchise property or plant by the light company to the gas company. The purpose of all this is manifest, and that purpose is entirely legitimate. The rights and powers of the light company were more comprehensive than those of the gas company. The former was empowered to furnish electricity as a motive power, while the latter was authorized to manufacture and sell it for illuminating purposes only. It is true that, as the sole stockholder, it owned the business, and controlled it; but only as stockholders in all corporations may be said to own and control the affairs of their corporations. Even in the Eisenman case, where no corporate body was kept alive, individual liability on the single shareholder was not imposed, because it was said by the court that the entire credit was given to the corporation, no fraud had been practiced by the stockholder, and the creditor had gotten all he had bargained for. It was further said that the creditor was in the same attitude after Eisenman's purchase of the stock as he was before. He was not injured or his interests affected in any way by such purchase Such is the case here. The corporate property of the

Louisville Gas Co. v. Kaufman, Straus & Co.

light company has not been conveyed to any one, and the business is being conducted as it was before the change of stockholders. The "good faith" required in the Eisenman case to prevent suspension is that which keeps alive the organization for legitimate purposes as against the purpose of using the mere corporate name for illegitimate or fraudulent purposes.

It is argued that, by the purchase of the stock, the gas company was simply carrying out the purpose of its charter amendment, which enabled it to manufacture, distribute, and sell electricity for illuminating purposes. But, as we have seen, it did not acquire under its charter the right to manufacture and distribute electricity, for supplying motive power. The electric light company alone had this right. If the gas company purchased the stock only as a means to an end—that of manufacturing and selling electricity for illumination—it would have confined the business to that end. It did not attempt to do this, but the light company continued to operate its own franchise with the power and rights conferred in its charter. It is not true that the gas company could only lawfully buy the stock by assuming the ownership of the business. The gas company, by purchasing the stock of other companies, as authorized by its charter amendment, could at last only become a mere stockholder; and this the law-makers must be supposed to have known. It was therefore as a controlling stockholder, or, if need be, a single stockholder, that the law contemplated it might control the manufacture, sale, and distribution of electricity. In this sense and in this way, the stockholders of all corporations do own and control its business. Wherefore, for the reasons indicated, the judgment below is reversed, and the petition is directed to be dismissed.